## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RASHID ELLIS,
7967 Stevens Road
Owings, MD 20736,

                *Plaintiff,*

        v.

ALEJANDRO N. MAYORKAS,
Secretary,
U.S. Department of Homeland Security,
3801 Nebraska Avenue, NW
Washington, DC 20016,

                *Defendant.*

CIVIL CASE NO. _____

JURY TRIAL DEMANDED

## COMPLAINT

    Plaintiff Rashid Ellis brings this action against Defendant Alejandro N. Mayorkas, Secretary of the United States Department of Homeland Security, acting in his official capacity ("Defendant"), for violations of Title VII for discrimination and hostile work environment.

## NATURE OF ACTION

1.    Plaintiff Rashid Ellis is a Special Agent in the United States Secret Service (USSS), a division of the Defendant Department of Homeland Security and has served in that capacity since May 2011.

2.    Mr. Ellis's coworkers have discriminated against him by repeatedly referring to him as a "Muslim terrorist."

3.     Despite the constant discriminatory comments and bullying by these coworkers – the most extreme of which have included threats to his family and physical attacks -, the Defendant has given them supervisory roles over Mr. Ellis.

4.     The Defendant unjustly disqualified Mr. Ellis from pursuing other job opportunities within the USSS.

5.     When Mr. Ellis challenged this disqualification, the Defendant retaliated and discriminated against him by putting Mr. Ellis on administrative leave without following proper due process.

6.     This leave was supposedly pending an investigation into allegations against Mr. Ellis.

7.     Mr. Ellis sought an investigation into the baseless allegations lodged against him, and the supposed subsequent investigation. Defendant never conducted an investigation into the baseless allegations made against Mr. Ellis.

8.     Agency Leadership further subjected Mr. Ellis to disparate treatment when it targeted him for unwarranted scrutiny based on a protectee's baseless complaint,

9.     Mr. Ellis brings this action to recover damages for Defendant's unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII").

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.    On October 27, 2021, Mr. Ellis filed a formal complaint of discrimination with Defendant.

13.    On May 5, 2023, Defendant issued a Final Agency Decision, which found no wrongdoing.

14.     On May 26, 2023, Mr. Ellis appealed the Final Agency Decision to the Office of Federal Operations.

15.     On January 8, 2024, the Office of Federal Operations issued a decision on Mr. Ellis' appeal, finding no wrongdoing.

16.     Mr. Ellis files this Complaint within 90 days of receiving a decision from the OFO, and he has exhausted his administrative remedies pursuant to 29 C.F.R. § 1614.

## PARTIES

17.     Plaintiff Rashid Ellis is a citizen of the United States and the State of Maryland. At all times relevant, he was Defendant's employee within the meaning of Title VII.

18.     Defendant Alejandro N. Mayorkas is named in his official capacity as the Secretary of the Department of Homeland Security, a federal agency headquartered in Washington, DC.  At all relevant times, Defendant has been Mr. Ellis' employer within the meaning of Title VII.

## STATEMENT OF FACTS

### *Mr. Ellis is a member of a protected class.*

19.     Mr. Ellis is African American and has dark skin. His race and color are apparent based on his physical appearance.

20.     Mr. Ellis's full name, Rashid Abduallah Malik Ellis, causes others to perceive him as Muslim.

### *Mr. Ellis holds official and unofficial leadership roles in the workplace.*

21.     Mr. Ellis is a Special Agent in the USSS and has served in that capacity since May 2011.

22.     Defendant has consistently awarded Mr. Ellis "Exceeds Expectations" in his performance reviews throughout his employment.

23.     Defendant has never subjected Mr. Ellis to formal disciplinary action.

24.     In October 2020, Defendant transferred Mr. Ellis from the Counter Assault Team (CAT) to the Presidential Protective Detail (PPD).

25.     In September 2023, Mr. Ellis took office as the Agency President representing the USSS in the Federal Law Enforcement Officers Association (FLEOA).

26.     Mr. Ellis has also taken on an unofficial leadership role related to social issues at USSS, proposing recommendations and strategies for combatting discrimination and racism in the workplace.

### *Mr. Ellis has been subjected to harassment and threats to his physical safety due to his race and perceived religion.*

27.     In May of 2011, Mr. Ellis was hired at the same time as Michael Hackney (GS-13) (White, non-Muslim sounding name).

28.     Soon thereafter, Mr. Hackney began making racially insensitive remarks, bragging about how he physically injured people with dark skin like Mr. Ellis's while employed as a Virginia State Police SWAT Operator.

29.     At that time, in 2011, Mr. Hackney began referring to Mr. Ellis in a derogatory fashion as Muslim.

30.     For example, in September 2011, Mr. Hackney referred Mr. Ellis's personal vehicle as "that Muslim car."

31.     Mr. Ellis regularly informed Mr. Hackney that he was Christian and that he preferred to be called American rather than be identified by any specific race or religion. But that did not stop the comments.

32.     In November 2015, Mr. Ellis was in Counter Assault BASIC Training with Mr. Hackney, among others.

33.   During the training, Mr. Ellis was repeatedly peer-rated by classmates – all white – as last in a class of 9, despite being described as one of the top 3 by the head instructor.

34.   It was during this training that Mr. Hackney took advantage of an exercise to physically attack Mr. Ellis.

35.   Mr. Hackney admitted to ATSAIC Joseph Berrios that he had physically attacked Mr. Ellis.

36.   When Mr. Ellis informed ATSAIC Berrios that he intended to report the incident, and the other incidents of harassment by Mr, Hackney, ATSAIC Berrios replied, "the juice isn't worth the squeeze."

37.   In April 2017, while working a protection detail, Mr. Hackney and ATSAIC Timothy O'Connor (GS-14) played a "joke" by having O'Connor pulling a live weapon on Mr. Ellis. In December 2019, while off duty and out of town for a protection detail, Mr. Hackney aggressively drove his SUV toward Mr. Ellis, who was walking with his then-1-year-old child and pregnant wife. Chris Thompson (GS-13) witnessed this incident.

38.   When Mr. Ellis informed Mr. Thompson that he intended to report the incident, he discouraged Mr. Ellis, saying, "that's how some people joke."

39.   Despite Mr. Ellis's efforts to address and mitigate discrimination within the Agency, he has consistently observed a pattern of racism and discrimination throughout his tenure with USSS.

40.   Mr. Hackney's actions, and the failure of leadership to address them, has created an environment of pervasive fear of retaliation that discourages individuals from reporting such incidents.

*__Defendant improperly and illegally disqualified Mr. Ellis from competing for two Hard-to-Staff
job openings.__*

41.     On July 9, 2021, Mr. Ellis bid on two Hard-to-Staff (HTS) Job Official Announcements
        (JOAs) for the USSS Airspace Branch (ASB) and James J. Rowley Training Center
        (JJRTC). Mr. Ellis was eligible for both positions.

42.     During their meeting on July 13, 2021, Mr. Ellis informed PPD Special Agent in Charge
        (SAIC) David Cho, SES, that he had bid on the HTS job announcements. Mr. Ellis
        explained that his goal was to transfer to ASB to develop and initiate a special project. His
        then assignment with the PPD and his preferred assignment with the Special Operations
        Division (SOD) ASB, are both within USSS' Office of Protective Operations (OPO).

43.     SAIC Cho confirmed that he was aware of the bids and supported Mr. Ellis' transfer to
        ASB or JJRTC, if selected.

44.     During this same meeting, SAIC Cho expressed to Mr. Ellis that the USSS had a problem
        with racism throughout the organization.

45.     SAIC Cho also mentioned that there may be a question regarding Mr. Ellis' eligibility for
        the job announcements and that he would check into it. However, he did not think it would
        be an issue.

46.     Mr. Ellis told SAIC Cho that he had confirmed his eligibility for other assignments prior
        to bidding on a JOA to come to PPD in 2020. SAIC Cho said he understood and would let
        Mr. Ellis know when he had confirmation.

47.     That same day, Mr. Ellis spoke with Human Resources Division (HUM) Workforce
        Planning Division (WPL) Analyst Patricia O'Leary to confirm that he was eligible. Ms.
        O'Leary responded that she was not sure but would call Mr. Ellis back.

48.     On information and belief, Ms. O'Leary reached out to HUM SAIC Elizabeth Lewis, who, in turn, disqualified Mr. Ellis from the JOAs. According to SAIC Lewis, Chief of Human Resources Susan Yarwood endorsed this decision.

49.     On July 14, 2021, Ms. O'Leary emailed Mr. Ellis to advise him that he was ineligible for the JOAs.

50.     Ms. O'Leary explained that Mr. Ellis would have been eligible had he 'SARCed' to PPD with a three-year commitment beginning in 2020. However, Mr. Ellis had 'JOAed' to PPD with a four-year commitment, even though no such policy existed at the time.

51.     Ms. O'Leary erroneously said that Mr. Ellis did not meet the required minimum of three years in Phase 2; Mr. Ellis had nearly five years in Phase 2 at that time.

52.     Later that day, Mr. Ellis informed SAIC Cho about Ms. O'Leary's email. SAIC Cho advised Mr. Ellis that he was "working on it," and that Mr. Ellis was SOD's number-one selection for the ASB JOA.

53.     On July 28, 2021, Ms. O'Leary sent an email to a group comprising nineteen high-level supervisors and Mr. Ellis' coworkers, stating, "To recap the issues: Ellis, Rashid – LEG [Legal] (Andrew Cannady) concurs that he is not eligible. No change was made to his status."

54.     On July 30, 2021, PPD ASAIC David Yamin called Mr. Ellis and told him that USSS' Legal Division had ruled him ineligible for the HTS ASB JOA.

55.     Also on July 30, 2021, Mr. Ellis called OPO SOD DAD Milton Wilson and advised him that the Agency ruled him ineligible for the HTS JOA for ASB, and explained his belief that the ruling was incorrect.

56.   Mr. Ellis shared an email in which SAIC Cho said that Mr. Ellis was SOD's "#1 selection" for the HTS ASB JOA.

57.   Later that afternoon, DAD Wilson called Mr. Ellis back and advised that he had spoken to unidentified involved individuals and confirmed that Mr. Ellis would have been the number-one selection had it not been for the interference by Human Resources.

58.   DAD Wilson asked Mr. Ellis to send him examples of agents who left PPD on similar JOAs after serving only one year on PPD. Mr. Ellis emailed DAD Wilson those examples along with an explanation of his understanding of USSS' HTS policy. Mr. Ellis was the first person in such a position, and a policy dictating his situation did not exist at that time.

59.   On August 2, 2021, Mr. Ellis met with Legal Division (LEG) ASAIC Dane Karvois and informed him that Legal disqualified him from a HTS JOA.

60.   ASAIC Karvois explained that, based on his understanding of policy, the Agency should not have disqualified Mr. Ellis. ASAIC Karvois advised Mr. Ellis that he would "look into it" and report back.

61.   Later that day, SAIC Cho called Mr. Ellis and told him that he was in discussions with his supervisor, DAD Michael Plati, about "pushing" to have Mr. Ellis transferred to ASB.

62.   The next day, August 3, 2021, DAD Wilson emailed Mr. Ellis and said that LEG was seeking review from HUM regarding Mr. Ellis' disqualification.

63.   DAD Wilson then forwarded Mr. Ellis an email from HUM SAIC Lewis stating that Chief Yarwood ruled against Mr. Ellis, and she had the final say.

64.   SAIC Lewis stated that Mr. Ellis' situation was different because he was disqualified.

65. According to SAIC Lewis, Mr. Ellis was ineligible because he joined PPD in 2020 via a JOA for a four-year assignment, whereas others typically entered PPD on a three-year assignment as a standard procedure.

66. There was no basis for her various assertions, and she was unable to point to any supporting policy documentation.

67. SAIC Lewis included Thomas Hamann, Patricia O'Leary, Andrew Cannady, and Darren Giacoletto on her email.

68. At that time, USSS was preparing to rotate Mr. Ellis to a less-desirable position in the VPPD (Vice Presidential Protection Detail). Accordingly, Mr. Ellis bid on a PPD JOA, and the Agency accepted his bid.

69. On August 6, 2021, Mr. Ellis had a follow-up meeting with LEG ASAIC Karvois, and informed him that the Agency disqualified him from the HTS JOAs.

70. ASAIC Karvois expressed that he thought he had taken care of the issue, and told Mr. Ellis that he would prepare a document to appeal Mr. Ellis' disqualification.

71. Later that day, Defendant released the Official Announcement for the JOA, ending Mr. Ellis' chances of being transferred to ASB.

72. After receiving the Official Announcement, Mr. Ellis also met with his direct supervisor, ATSAIC David Iosilevich, and expressed his disappointment about Defendant wrongly disqualifying him from the ASB JOA.

73. ATSAIC Iosilevich indicated that PPD leadership had "pushed" for Mr. Ellis' eligibility.

74. On August 8, 2021, Mr. Ellis spoke with Counter Assault ASAIC Kurt Lewis, who told him that it was his understanding that Mr. Ellis was eligible for HTS announcements.

75.     On August 9, 2021, Mr. Ellis filed an Informal Grievance with the USSS Employee Relations Division (PRF) to appeal his disqualification.

76.     Mr. Ellis provided copies of his grievance to his direct supervisor, ATSAIC Iosilevich, and LEG ATSAIC Karvois and sent a summary of the Informal Grievance to SAIC Lewis.

77.     On August 31, 2021, PRF Division Chief Watson informed Mr. Ellis over the phone that the Agency was reassigning Mr. Ellis's complaint to HUM DAD Darren Giacoletto.

78.     Darren Giacoletto was Chief Yarwood's direct report and was copied on SAIC Lewis' email that disqualified Mr. Ellis weeks earlier.

79.     During that same phone call, Mr. Ellis explained his insistence on an unbiased grievance official and expressed frustration at the barriers that racial discrimination had placed in the path of his career. He joked that his career "drove [him] to drink."

80.     On August 31, 2021, Mr. Ellis received an email from PRF advising that WPL Division Chief Hamann denied his informal grievance. Mr. Ellis replied to PRF and cc'd Ms. Watson that the Agency had changed his grievance official.

81.     PFR Division Chief Watson responded that the Agency would be rescinding WPL Division Chief Hamann's decision.

82.     Mr. Ellis reviewed Division Chief Hamann's written decision, which falsely stated that Mr. Ellis could have rotated into PPD as a matter of course in 2019, but instead transferred to PPD via JOA.

### *Defendant placed Mr. Ellis on administrative leave under false pretenses.*

83.     After conferring with SAIC Lewis, HUM Chief Yarwood instructed PFR Division Chief Watson to create a memorandum for record (MFR) documenting her conversation with Mr. Ellis on August 31, 2021.

84. In the MFR, dated September 1, 2021, PFR Division Chief Watson inaccurately stated that Mr. Ellis expressed gratitude to her for caring about his health at the start of their August 31, 2021, phone call and claimed that he said, "I am an alcoholic; that is my condition." Additionally, she included false statements about Mr. Ellis.

85. PFR Division Chief Watson sent the MFR to HUM Chief Yarwood, who in turn forwarded it to LEG.

86. HUM Chief Yarwood sent the MFR to OPO Assistant Director Kim Cheatle on September 1, 2021, stating: "I recommend taking his gun, etc and putting him on admin leave and referring for a fitness for duty."

87. The recommended evaluation also included a nine-month alcohol program for Mr. Ellis.

88. On September 2, 2021, HUM Chief Yarwood emailed LEG Chief Counsel Thomas Huse, copying others and including DAD Plati for the first time, and said: "Kim [Cheatle] would like to put [Mr. Ellis] on admin leave pending a FFD. Mike Plati is the appropriate DAD. Who can assist in drafting the letter for them today?"

89. DAD Plati emailed DAD Wilson regarding HUM Chief Yarwood's instruction and expressed that he was "perplexed."

90. DAD Wilson replied to DAD Plati that he "was under the impression it was LEG and Security Management Division (SMD) who made the decision to place [Mr. Ellis] on administrative leave, but [LEG Attorney Advisor Andrew Cannady] said AD Cheatle did."

91. DAD Wilson added that he wanted to make sure the decision wasn't based on Mr. Ellis' efforts to get a different assignment and was waiting for a response from LEG Attorney Advisor Andrew Cannady.

92.   Later that same day, SAIC Cho called Mr. Ellis and asked him if he was dependent on alcohol.

93.   Mr. Ellis, who is not an alcoholic, was unaware that HUM Chief Yarwood had circulated PFR Division Chief Watson's MRF.

94.   He therefore expressed his surprise at SAIC Cho's question and emphatically answered no.

95.   SAIC Cho advised Mr. Ellis that the Agency was placing him on administrative leave for alcohol dependency and would have to undergo an alcohol treatment program.

96.   SAIC Cho instructed Mr. Ellis to turn in his equipment the next morning.

97.   On September 2, 2021, SMD Chief Michael Mullen emailed SAIC Cho, writing: "As far as I know there has [sic] been no incidents to indicate that [Mr. Ellis] is misusing alcohol."

98.   Chief Mullen also referenced the false statements Human Resources was spreading about Mr. Ellis and his family and explained that Andrew Cannady informed him that SAIC Cho intended to place Mr. Ellis on Administrative Leave.

99.   SAIC Cho asked Chief Mullen whether they or anyone else could do anything to resolve the situation without placing Mr. Ellis on administrative leave.

100.  Chief Mullen replied that a memo from Mr. Ellis and a supervisor "should suffice" seemingly resolving the issue.

101.  On September 3, 2021, Mr. Ellis received an email stating that DAD Giacoletto denied his informal grievance in contradiction of USSS policy.

102.  On the morning of September 3, 2021, Mr. Ellis reported to the Eisenhower Executive Office Building, where he signed an administrative leave memorandum authored by Andrew Cannady and turned in his equipment.

103.   While turning in his gear, SAIC Cho, advised Mr. Ellis to write a memo explaining that he was not an alcoholic and requesting reinstatement.

104.   DSAIC Ted Arruda and ASAIC Christina Bentham escorted Mr. Ellis out of the building.

105.   Later that day, ASAIC Bentham told Mr. Ellis, "Don't be surprised if this was retaliation by them for you filing that grievance."

106.   She added that she used to work in HUM and commented that "that's how they are. They stick together."

### *Defendant singled out Mr. Ellis after a protectee complained.*

107.   On September 3, 2021, ATSAIC Iosilevich called Mr. Ellis and asked if he had said anything to "Cowboy," a USSS protectee. Mr. Ellis responded that his recent communications with "Cowboy" had been pleasant.

108.   ATSAIC Iosilevich explained that his inquiry was related to an incident that took place on or around August, 28, 2021, when Mr. Ellis drove "Cowboy" and her friends home after a late night of dancing.

109.   During the drive, one of Cowboy's friends repeatedly demanded that Mr. Ellis take a detour and stop at a location other than Cowboy's destination.

110.   Mr. Ellis declined to do so, explaining to Cowboy's friend that USSS "is not an Uber service."

111.   Upon arriving at their destination, "Cowboy" thanked Mr. Ellis and apologized for her friend's conduct.

112.   Per ATSAIC Iosilevich, after these events, Cowboy complained to USSS regarding Mr. Ellis' "Uber" comment.

113.    ATSAIC Iosilevich instructed Mr. Ellis to write a memorandum detailing his interaction with "Cowboy" and her friends, and to submit it with his request for reinstatement.

114.    ATSAIC Iosilevich further instructed Mr. Ellis to omit certain details that would reflect negatively on "Cowboy" and/or her friends and relatives.

115.    As instructed, Mr. Ellis submitted his memorandum and request for reinstatement to ATSAIC Iosilevich on September 3, 2021.

116.    At this time, Defendant stated that it was planning Mr. Ellis on Administrative Leave for the purpose of investigating these comments,

117.    To date, the Agency has not conducted an investigation.

118.    On September 8, 2021, Mr. Ellis emailed ATSAIC Iosilevich, requesting the return of his USSS credentials. Mr. Ellis explained that he had not received due process and had done nothing wrong. Soon after, ASAIC John Bush emailed Mr. Ellis, denying his request.

### *Defendant continued to retaliate against Mr. Ellis.*

119.    On September 9, 2021, Mr. Ellis submitted a formal grievance to appeal the September 3, 2021, denial of his informal grievance regarding his wrongful disqualification.

120.    On September 10, 2021, Mr. Ellis contacted a GS 15 Supervisor, who expressed his belief that Mr. Ellis's administrative leave was retaliatory, and that Mr. Ellis should "go on offense."

121.    This supervisor referred to other examples of retaliation within USSS and encouraged Mr. Ellis to seek legal counsel.

122.    Later that same day, September 10, 2021, Mr. Ellis contacted EAP Dr. Kier Maxwell seeking help with his situation. Dr. Maxwell expressed that she did not understand why the

Agency had not reinstated Mr. Ellis. Dr. Maxwell instructed Mr. Ellis to contact SAF directly and said that if they had not heard of him, "there's a problem."

123. Mr. Ellis then contacted Safety and Health (SAF) to request instructions for reinstatement. Ms. Sherrill Abramson answered the phone and said that SAF had no record of the Agency referring Mr. Ellis to them.

124. When Mr. Ellis called SAF again on September 13, 2021, Ms. Abramson said SAF still had no record of the Agency referring Mr. Ellis there.

125. On September 14, 2021, SAIC Cho informed Mr. Ellis that the Agency would reinstate him effective September 15, 2021. SAIC Cho explained that he sent LEG Mr. Ellis' request for reinstatement as well as a memo, after which Defendant decided to reinstate Mr. Ellis.

126. Mr. Ellis also spoke to ASAIC Bush on September 14, 2021. ASAIC Bush asked Mr. Ellis if he was going to "put this behind" him, and Mr. Ellis replied that he wanted an investigation. ASAIC Bush stressed that Mr. Ellis should put the administrative leave behind him and warned that Mr. Ellis would "cause a lot of trouble" for himself if he kept "bringing up retaliation." ASAIC Bush also advised Mr. Ellis to "stop beating a dead horse" and cease pursuit of his grievance.

127. On September 15, 2021, SAIC Cho reissued Mr. Ellis his equipment. SAIC Cho told Mr. Ellis that he would promote Mr. Ellis to GS-14 to get around the four-year service commitment issue that disqualified him. SAIC Cho emphasized that everyone in Mr. Ellis' chain of command, "up to the AD level," "pushed" for Mr. Ellis to be eligible and selected for the HTS ASB JOA.

128. On September 17, 2021, PRF informed Mr. Ellis that HUM Chief Yarwood would serve as the deciding official for his formal grievance.

129.     As Chief Yarwood had already disqualified him twice and had placed him on administrative leave, Mr. Ellis requested that the Agency assign his formal grievance to a different deciding official.

***Mr. Ellis filed EEO and OIG complaints, and Defendant retaliated against him.***

130.     On September 20, 2021, Mr. Ellis filed an Equal Employment Opportunity (EEO) informal complaint alleging that Defendant subjected him to a hostile work environment based on skin tone (i.e., race and color). Mr. Ellis identified wrongly disqualifying him from the HTS JOAs, baselessly placing him on administrative leave, and requiring him to document his interaction with Cowboy as specific discriminatory and retaliatory acts by Defendant.

131.     On September 21, 2021, Mr. Ellis filed complaints with DHS OIG (Office of Inspector General) and USSS Office of Professional Responsibility (Inspections) requesting investigations of the retaliation against him for his informal grievance.

132.     On September 30, 2021, Mr. Ellis reported to Room 60 for a meeting with ASAIC Bush, DSAIC Arruda, and then-DSAIC Darryl Volpicelli about his complaint. DSAIC Arruda explained that Legal received Mr. Ellis' complaint to Inspections, "looked into" the decision to place him on administrative leave and determined that it was not retaliation.

133.     On October 4, 2021, the EEO counselor interviewed ATSAIC Iosilevich and HUM Chief Yarwood in connection with Mr. Ellis' informal EEO complaint.

134.     On October 5, 2021, the EEO counselor interviewed HUM SAIC Lewis regarding Mr. Ellis' informal EEOC complaint.

135.     On October 8, 2021, PRF advised Mr. Ellis that Assistant Director Jeremy Sheridan denied his formal grievance.

136. On October 13th, 2021, ASAIC Bush informed Mr. Ellis that he was aware of the EEO Complaint.

137. On October 26, 2021, Mr. Ellis filed a formal EEOC complaint against Defendant, alleging discrimination and a hostile work environment.

138. On December 23, 2021, the Agency reassigned ASAIC Bush, and on January 15, 2022, ATSAIC Steve Gleason introduced himself to Mr. Ellis as his new supervisor.

139. On January 16, 2022, Mr. Ellis bid for a promotion to ATSAIC within the Talent Acquisition Division, similar to a role Mr. Ellis previously held in the private sector.

140. On February 8, 2022, Mr. Ellis obtained a copy of PRF Division Chief Danielle Watson's EEO affidavit. Chief Watson misrepresented her conversation with Mr. Ellis on August 31, 2021, falsely indicating that Mr. Ellis was an alcoholic.

141. At this time, Mr. Ellis became aware of the MFR for the first time.

142. On February 24th, 2022, Mr. Ellis obtained a copy of HUM Chief Susan Yarwood's EEO Affidavit. Chief Yarwood consistently portrays Mr. Ellis as someone who has difficulties with alcohol, despite never having a direct conversation with him. Chief Yarwood's affidavit also contained reference to the MFR prepared by PRF Chief Watson.

143. The testimony Division Chief Watson's provided in the EEO affidavit contradicted her statements in the MFR.

144. On March 2, 2022, Mr. Ellis submitted a second complaint to the USSS Inspections Division, specifically alleging retaliation by SAIC Lewis, Chief Yarwood, and Chief Watson as co-conspirators implicated in his case.

145. On March 3, 2022, Mr. Ellis lodged additional complaints with the DHS Office of Inspector General (OIG) and the Office of Special Counsel (OSC). In these complaints, he also

identified SAIC Lewis, Susan Yarwood, and Danielle Watson responsible management officials involved in the alleged misconduct.

146.    In response to Susan Yarwood preventing him from being promoted, Mr. Ellis notified EEO of his intent to file a second EEO complaint against Chief Yarwood for retaliation.

147.    On March 9, 2022, Mr. Ellis told ATSAIC Gleason that he intended to submit a memorandum to Investigations, challenging the accuracy of Division Chief Watson's MFR. Gleason provided Mr. Ellis with instructions on how to proceed.

148.    Mr. Ellis submitted his memorandum on March 11, 2022.

149.    On March 20, 2022, Mr. Ellis filed a third complaint with the USSS Inspections Division, in which he named Kathy Dipippa, Andrew Cannady, and other individuals as additional conspirators. In the complaint, Mr. Ellis stressed the need for an investigation to commence before SAIC Lewis's retirement, which was scheduled for March 31st, 2022.

150.    On March 21, 2022, Mr. Ellis met briefly with DAD Wilson who asked if he had been in touch with DHS OIG or Inspections. DAD Wilson also made clear to Mr. Ellis that he "wasn't on the same page" with those who decided to place Mr. Ellis on Administrative Leave.

151.    On April 1, 2022, Human Resources released an updated policy, written by Chief Yarwood and Thomas Hamann, which effectively banned Mr. Ellis from HTS positions by adding a minimum time commitment for Phase 2 assignments before being eligible for reassignment.

152.    In April 2022, Mr. Ellis had multiple conversations with DAD Wilson where Wilson continuously expressed his doubts about potential accountability for Chief Yarwood, Division Chief Watson, or SAIC Lewis.

153.    In June 2022, Mr. Ellis lodged his fourth complaint with USSS Inspections, this time under the Anti-Harassment Program (AHP). Mr. Ellis provided a detailed overview of the discriminatory harassment that he was subjected to by white and light-skinned individuals.

154.    Later in June 2022, DAD Wilson reached out to Mr. Ellis and informed him that HUM Chief Yarwood was subjected to intake procedures as part of the processing of Mr. Ellis's complaint, and no action would be taken against those who discriminated against Mr. Ellis. And in particular, there would be no consequences for HUM Chief Yarwood.

155.    In July 2022, Mr. Ellis bid on a position at JJRTC. The Agency selected him for this position.

### COUNT I
(42 U.S.C. § 2000e, et seq. – Discrimination on the Basis of Race)

156.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

157.    Defendant discriminated against Plaintiff on the basis of race.

158.    By and through its conduct, Defendant violated Title VII.

159.    Defendant's actions were intentional, reckless, and malicious.

160.    As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

### COUNT II
(42 U.S.C. § 2000e, et seq. – Discrimination on the Basis of Color)

161.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

162.    Defendant discriminated against Plaintiff on the basis of color.

163.    By and through its conduct, Defendant violated Title VII.

164.    Defendant's actions were intentional, reckless, and malicious.

165.   As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT III
(42 U.S.C. § 2000e, et seq. – Discrimination on the Basis of Religion)

166.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

167.   Defendant discriminated against Plaintiff on the basis of religion.

168.   By and through its conduct, Defendant violated Title VII.

169.   Defendant's actions were intentional, reckless, and malicious.

170.   As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT IV
(42 U.S.C. § 2000e, et seq. – Hostile Work Environment on the Basis of Race)

171.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

172.   Defendant subjected Plaintiff to harassment and a hostile work environment because of his race.

173.   By and through its conduct, Defendant violated Title VII.

174.   Defendant's actions were intentional, reckless, and malicious.

175.   As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT V
(42 U.S.C. § 2000e, et seq. – Hostile Work Environment on the Basis of Color)

176.   Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

177.   Defendant subjected Plaintiff to harassment and a hostile work environment because of his color.

178.  By and through its conduct, Defendant violated Title VII.

179.  Defendant's actions were intentional, reckless, and malicious.

180.  As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT VI
### (42 U.S.C. § 2000e, et seq. – Hostile Work Environment on the Basis of Religion)

181.  Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

182.  Defendant subjected Plaintiff to harassment and a hostile work environment because of his perceived religion.

183.  By and through its conduct, Defendant violated Title VII.

184.  Defendant's actions were intentional, reckless, and malicious.

185.  As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT VII
### (42 U.S.C. § 2000e, et seq. – Retaliation)

186.  Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

187.  Defendant subjected Plaintiff to retaliation for his protected activity.

188.  By and through its conduct, Defendant violated Title VII.

189.  Defendant's actions were intentional, reckless, and malicious.

190.  As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant on all Counts and award him damages including $300,000 in compensatory

damages for pain and suffering, retroactive promotion, back pay, front pay, lost benefits consequential damages, pre- and post-judgment interest, costs, the increased tax burden on any award, reasonable attorneys' fees, any other relief allowed under applicable law, and any other relief that the Court deems reasonable and just.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all Counts contained in the Complaint.


Respectfully submitted,

ALAN LESCHT AND ASSOCIATES, P.C.

Tamara Slater (D.C. Bar No. 1616337)
David W. Blum (D.C. Bar No. 1029697)
1825 K Street, NW, Suite 750
Washington, DC 20006
Tel: (202) 463-6036
Fax: (202) 463-6067
tamara.slater@leschtlaw.com
david.blum@leschtlaw.com
*Counsel for Plaintiff*