**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

RASHID ELLIS

          Plaintiff,

v.

KRISTI L. NOEM,
Secretary of Homeland Security


          Defendant.

---

Civ. No. 24-977 (EGS)

---

**<u>MEMORANDUM OPINION</u>**

Plaintiff Rashid Ellis ("Mr. Ellis") has served as a Special Agent with the United States Secret Service ("USSS" or "Secret Service") division of the Department of Homeland Security ("DHS") since 2011. *See* Pl.'s Am. Compl. ("Am. Compl."), ECF No. 7.[1] Mr. Ellis brings this suit against Kristi Noem[2], in her official capacity as DHS Secretary ("Defendant" or "Agency"), for alleged unlawful employment discrimination, retaliation, and a hostile work environment. *See id.* Pending before the Court is Defendant's Motion to Dismiss Mr. Ellis's Amended Complaint in full ("Motion to Dismiss"). *See* Def's Mot.

---

[1] When citing electronic filings throughout this Opinion, the Court refers to the ECF page numbers, not the page numbers of the filed documents.
[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current Secretary of Homeland Security is substituted as Defendant for her predecessor. *See* Fed. R. Civ. P. 25(d).

to Dismiss Am. Compl. & Mem. in Supp. Thereof ("Mot."), ECF No. 10. Mr. Ellis opposes Defendant's Motion. *See* Pl.'s Opp'n to Def's Mot. to Dismiss Am. Compl. & Mem. in Supp. Thereof ("Opp'n"), ECF No. 12.

Upon careful consideration of the Motion, Opposition thereto, Reply, the entire record, and for the reasons stated below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. Background

### A. Factual

The following facts reflect the allegations in the operative complaint and the documents incorporated by reference therein, which the Court assumes are true for the purposes of deciding this motion and construes in Mr. Ellis's favor. *See Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir. 2015). Mr. Ellis began serving as a Special Agent with the USSS in May 2011. *See* Am. Compl., ECF No. 7 ¶ 1. He was "consistently awarded . . . 'Exceeds Expectations' in his performance reviews throughout his employment." *Id.* ¶ 22. Mr. Ellis has served on the "Secret Service's Counter Assault Team, the Presidential Protective [Division], and as an instructor at the James J. Rowley Training Center where he has taught both new and experienced agents about counter-surveillance and unmanned aerial systems (UAS or drones)." Opp'n, ECF No. 12 at 1. He has also "served in various leadership capacities for the Federal

Law Enforcement Officers Association (FLEOA)" and has been a "tireless advocate for racial equality within the Agency." *Id.; see also* Am. Compl., ECF No. 7 ¶¶ 25, 26.

Mr. Ellis is "African American and has dark skin." Am. Compl., ECF No. 7 ¶ 19. His "race and color are apparent based on his physical appearance." *Id.* His full name is "Rashid Abdullah Malik Ellis" which "causes others to perceive him as Muslim." *Id.* ¶ 20. "During his time with the Secret Service, Mr. Ellis's coworkers have repeatedly discriminated against him on the basis of his race, skin tone, and perceived religion, which has included referring to Mr. Ellis as a 'Muslim Terrorist.'" *Id.* ¶ 2. When he "complained about [] discriminatory behavior, the Agency took no corrective action" and instead "placed [] discriminatory employees in supervisory roles over Mr. Ellis." *Id.* ¶ 3.

Mr. Ellis began suffering from discriminatory harassment when he joined the Agency in 2011, the same time as "another agent, Michael Hackney (GS-13, white male)." Opp'n, ECF No. 12 at 3 (citing Am. Compl., ECF No. 7 ¶ 27). "Almost immediately, Mr. Hackney subjected Mr. Ellis to racial invective, bragging about how he would physically injure people with dark skin like Mr. Ellis during his time with the Virginia State Police SWAT team[.]" *Id.* (citing Am. Compl., ECF No. 7 ¶ 28). Mr. Hackney also "derogatorily refer[ed] to Mr. Ellis as a 'Muslim' . . .

and call[ed] his vehicle 'that Muslim car.'" *Id.* (citing Am. Compl., ECF No. 7 at 3). Mr. Ellis "regularly informed Mr. Hackney that he was Christian and that he preferred to be called American rather than be identified by any specific race or religion[,] [b]ut that did not stop the comments." Am. Compl., ECF No. 7 ¶ 31.

The harassment that Mr. Ellis experienced went beyond discriminatory comments. In "2015, while Mr. Ellis and Mr. Hackney were in Counter Assault BASIC training together, Mr. Hackney used an exercise as an opportunity to physically attack Mr. Ellis." *Id.* (citing Am. Compl., ECF No. 7 ¶ 34). Mr. Ellis "reported this incident to [Assistant to the Special Agent in Charge ("ATSAIC")] Joseph Berrios, [to] whom Mr. Hackney admitted that he physically attacked Mr. Ellis, but Mr. Berrios took no action, telling Mr. Ellis that 'the juice isn't worth the squeeze.'" *Id.* (citing Compl., ECF No. 7 ¶¶ 35-36).

In 2017, Mr. Hackney and Tim O'Connor, another agent, "pulled a live weapon on Mr. Ellis as a 'joke'" while he was "working a protection detail." *Id.* (citing Am. Compl., ECF No. 7 ¶ 37). In 2019, while Mr. Ellis was "off duty and walking with his then 1-year-old child and pregnant wife, Mr. Hackney aggressively drove his SUV towards Mr. Ellis and his family as though he was going to run them over." *Id.* (citing Am. Compl., ECF No. 7 ¶ 37). Another agent, Chris Thompson, witnessed the

SUV incident, but when Mr. Ellis told Mr. Thompson that he
intended to report the incident, Mr. Thompson replied '"that's
how some people joke."' *Id.* (citing Am. Compl., ECF No. 7 ¶ 38).
According to Mr. Ellis, "Mr. Hackney's actions, and the failure
of leadership to address them, has created an environment of
pervasive fear of retaliation that discourages individuals from
reporting such incidents." Am. Compl., ECF No. 7 ¶ 40.

On July 9, 2021, Mr. Ellis "bid for two hard-to-staff []
positions in the Secret Service's Airspace Branch and at the
James J. Rowley Training Center." *Id.* He alleges that he was
eligible for both positions. *See id.* (citing Am. Compl., ECF No.
7 ¶ 41). According to Mr. Ellis, the "Special Agent in Charge
[("SAIC")], David Cho, told Mr. Ellis that he supported his
application, but that the USSS had a problem with racism
throughout the organization." *Id.* (citing Am. Compl., ECF No. 7
¶¶ 43-44). Even though Mr. Ellis "had already confirmed that he
was eligible for the positions . . . [Human Resources ("HUM")]
SAIC Elizabeth Lewis and Chief Human Resources Officer Susan
Yarwood [("Chief Yarwood")] disqualified Mr. Ellis." *Id.* (citing
Am. Compl., ECF No. 7 ¶¶ 48-51).

When Mr. Ellis notified Mr. Cho of "[Chief] Yarwood's
decision; Mr. Cho informed Mr. Ellis that he was the number one
selection and that he would look into it." *Id.* (citing Am.
Compl., ECF No. 7 ¶ 52). On July 30, 2021, "[Presidential

Protective Division ("PPD")] ASAIC David Yamin called Mr. Ellis and told him that USSS' Legal Division had ruled him ineligible." *Id.* (citing Am. Compl., ECF No. 7 ¶ 54). Later that day, Mr. Ellis "called OPO [Special Operations Division ("SOD")] [Deputy Assistant Director ("DAD")] Milton Wilson [("Mr. Wilson")] and advised him that the Agency had ruled him ineligible, and that the ruling was incorrect." *Id.* (citing Am. Compl., ECF No. 7 ¶ 55). Mr. Wilson "called Mr. Ellis back and told him that he would have been the number one selection for the positions without interference from HR." *Id.* (citing Am. Compl., ECF No. 8 ¶ 57). Mr. Ellis "followed up with various Agency officials, who all tried to justify [his] disqualification on specious grounds without supporting policy documentation." *Id.* (citing Am. Compl., ECF No. 7 ¶¶ 58-67). Mr. Ellis also "met with his direct supervisor, ATSAIC David Iosilevich [("ATSAIC Iosilevich")], and expressed his disappointment about Defendant wrongly disqualifying him from the" job. Am. Compl., ECF No. 7 ¶ 72.

"On August 9, 2021, Mr. Ellis filed an informal grievance with the USSS Employee Relations Division to appeal his disqualification." Opp'n, ECF No. 12 at 4 (citing Am. Compl., ECF No. 7 ¶ 75). On August 31, 2021, PRF Division Chief Danielle Watson ("Chief Watson") called Mr. Ellis regarding his grievance. *See id.* During the phone call, Mr. Ellis "explained

his insistence on an unbiased grievance official and expressed frustration at the barriers that racial discrimination had placed in the path of his career. He joked that his career 'drove [him] to drink.'" Am. Compl., ECF No. 7 ¶ 79 (alteration in original).

Chief Yarwood conferred with SAIC Lewis, then "instructed Chief Watson to create a memorandum for record (MFR) documenting her conversation with Mr. Ellis on August 31, 2021." Opp'n, ECF No. 12 at 5 (citing Am. Compl., ECF No. 7 ¶ 83). Chief Watson "subsequently documented the conversation in the MFR by falsely claiming that Mr. Ellis had explicitly informed her 'I am an alcoholic, that is my conditions' as well as other false statements." *Id.* (citing Am. Compl., ECF No. 7 ¶ 84); *see also* Def. Ex. 2, ECF No. 10-3. Chief Yarwood wrote in an email to USSS Assistant Director Kim Cheatle that she "recommended taking his gun, etc. and putting him on admin leave and referring for a fitness for duty." Opp'n, ECF No. 12 at 5 (citing Am. Compl., ECF No. 7 ¶ 86). Chief Yarwood indicated in a separate email to others that "Director Cheatle recommended a nine-month alcohol program for Mr. Ellis." *Id.* (citing Am. Compl., ECF No. 7 ¶ 87). Mr. Ellis maintains that he "is not an alcoholic and has never been." *Id.* (citing Am. Compl., ECF No. 7 ¶ 93). "As a result of Director Cheatle's recommendation, Mr. Ellis had to turn in his gear in front of his peers, a humiliating experience, and had to

write a memorandum explaining that he was not an alcoholic and requesting reinstatement." *Id.* (citing Am. Compl., ECF No. 7 ¶ 103).

While Mr. Ellis was on administrative leave, ATSAIC Iosilevich, Mr. Ellis's supervisor at the time, called him and asked if he had said anything to "Cowboy", a protectee. Am. Compl., ECF No. 7 ¶ 107. Mr. Ellis responded that his recent interactions with this protectee had been "pleasant." *Id.* ATSAIC Iosilevich explained that his questions related to an incident on August 28, 2021 in which Mr. Ellis drove "Cowboy" and her friends home after a night of dancing. *Id.* ¶ 108. One of Cowboy's friends repeatedly asked Mr. Ellis to stop somewhere else on their way to Cowboy's destination, and Mr. Ellis responded that the USSS was not an "Uber service." *Id.* ¶¶ 109, 110. At the end of the ride, Cowboy thanked Mr. Ellis and apologized to him for her friend's behavior. *See id.* ¶ 111. According to ATSAIC Iosilevich, Cowboy complained about this incident afterwards. *Id.* ¶ 112.

ATSAIC Iosilevich instructed Mr. Ellis to write a memorandum about this incident and submit it along with his request for reinstatement. *See id.* ¶ 113. ATSAIC Iosilevich also instructed Mr. Ellis to "omit certain details that would reflect negatively on 'Cowboy' and/or her friends and relatives." *Id.* ¶ 114. Mr. Ellis wrote the memorandum, as instructed, on September

8

3, 2021. *See id.* ¶ 115. The Agency informed Mr. Ellis that it was placing him on Administrative Leave to investigate the comments, but to date, the Agency has conducted no such investigation. *See id.* ¶¶ 116, 117. "On September 8, 2021, Mr. Ellis emailed ATSAIC Iosilevich, requesting the return of his USSS credentials. Mr. Ellis explained that he had not received due process and had done nothing wrong. Soon after, ASAIC John Bush emailed Mr. Ellis, denying his request." *Id.* ¶ 118.

On September 9, 2021, while Mr. Ellis was on Administrative Leave, he submitted a formal grievance to appeal the September 3, 2021 denial of his informal grievance with respect to his disqualification from the hard-to-staff positions in July-August 2021. *Id.* ¶ 119. An unidentified GS-15 Supervisor informed Mr. Ellis on September 10, 2021 that he believed that "Mr. Ellis's administrative leave was retaliatory, and that Mr. Ellis should 'go on offense.'" *Id.* ¶ 120. That GS-15 Supervisor informed Mr. Ellis of other examples of retaliation within USSS and "encouraged Mr. Ellis to seek legal counsel." *Id.* ¶ 121. Mr. Ellis then contacted Employee Assistance Program ("EAP") Dr. Kier Maxwell ("Dr. Maxwell") who expressed confusion as to why the Agency had not reinstated Mr. Ellis and suggested he contact the Safety and Health ("SAF") office. *Id.* ¶ 122. According to Dr. Maxwell, if SAF had not heard of Mr. Ellis for any purported evaluation related to his administrative leave, "there's a

problem." *Id.* Mr. Ellis contacted SAF to request instructions for reinstatement, but the office "had no record of the Agency referring Mr. Ellis to them." *Id.* ¶ 123. Mr. Ellis called back shortly afterwards, on September 13, 2021, and the same person told Mr. Ellis there was still no record of the Agency referring him to them. *Id.* ¶ 124.

Without conducting any evaluation or investigation, the Agency reinstated Mr. Ellis effective September 15, 2021. *Id.* ¶¶ 7, 125. SAIC Cho informed Mr. Ellis of this decision on September 14, 2021, explaining that he had sent Mr. Ellis's request for reinstatement and a memorandum to the Legal Department. *Id.* Mr. Ellis spoke to ASAIC Bush that same day and ASAIC Bush asked Mr. Ellis if he was going to 'put this behind him[.]" *Id.* ¶ 126. Mr. Ellis responded that he wanted an investigation. *See id.* "ASAIC Bush stressed that Mr. Ellis should put the administrative leave behind him and warned that Mr. Ellis would 'cause a lot of trouble' for himself if he kept 'bringing up retaliation"', advising that Mr. Ellis should '"stop beating a dead horse[.]"' *Id.*

On September 17, 2021, Mr. Ellis was informed that Chief Yarwood would serve as the deciding official for his formal grievance about the hard-to-staff disqualifications. *See id.* ¶ 128. Mr. Ellis requested that the Agency assign his grievance to someone else because Chief Yarwood had already twice

10

disqualified him from positions and placed him on administrative leave. *See id.* ¶ 129.

On September 20, 2021, Mr. Ellis filed an informal Equal Employment Opportunity ("EEO") complaint alleging that the Agency subjected him to a hostile work environment on the basis of his skin tone (race and color). *See id.* ¶ 130.[3] Mr. Ellis "identified wrongly disqualifying him from the HTS JOAs, baselessly placing him on administrative leave, and requiring him to document his interaction with Cowboy as specific discriminatory and retaliatory acts by Defendant." *Id.* The EEO counselor who was assigned to Mr. Ellis's case interviewed ATSAIC Iosilevich, Chief Yarwood, and SAIC Lewis with respect to Mr. Ellis's informal EEO complaint. *See id.* ¶¶ 133, 134. ASAIC Bush also informed Mr. Ellis on October 13, 2021 that he was aware of the EEO complaint. *See id.* ¶ 136.

On September 21, 2021, Mr. Ellis also filed complaints with the DHS Office of Inspector General ("OIG") and USSS Office of Professional Responsibility and requested investigations into the retaliation against him for his formal grievance. *Id.* ¶ 131. On September 30, 2021, ASAIC Bush, DSAIC Arruda, and then-DSAIC

---

[3] Defendant only attached Mr. Ellis's formal EEO complaint as an exhibit, not his informal complaint. Defendant also does not attach several of the complaints to other DHS entities that Mr. Ellis filed during the relevant time period. Mr. Ellis attached his EEO intake form as an exhibit to his Opposition. *See* Pl.'s Ex. 1, ECF No. 12-1.

Volpicelli explained that "Legal received Mr. Ellis's complaint
to Inspections [Office of Professional Responsibility], 'looked
into' the decision to place him on administrative leave and
determined that it was not retaliation." *Id.* ¶ 132. Mr. Ellis
was informed on October 8, 2021 that Assistant Director Jeremy
Sheridan denied his formal grievance. *See id.* ¶ 135.

On October 27, 2021, Mr. Ellis filed his formal EEO
complaint. *See id.* ¶ 137; *see also* Def. Ex. 5, ECF No. 10-6. In
his formal complaint, Mr. Ellis identified that he was a member
of the following protected categories: "[B]lack, dark-skin
colored, Islamic sounding name." Def. Ex. 5, ECF No. 10-6 at 6.
He alleged that due to his race, skin color, and
ethnic/religious sounding name", he "experienced two adverse
personnel actions between August 6[], 2021 and September 3[],
2021." *Id.* Further, Mr. Ellis stated that he was "aware of other
similarly situated (self-described) White employees who have
been treated differently" than him. *Id.* He identified the harm
that resulted from these actions as "loss of a qualified
position and unjust administrative leave" as well as
humiliation, exclusion, harassment, and a hostile work
environment. *Id.* As the first specific adverse personnel action,
Mr. Ellis identified how he was "disqualified and as a result
not selected for a hard[-]to[-] staff" position, despite being
the "best qualified candidate" and "#1 selection." *Id.* Mr. Ellis

pointed out that language in the Agency's policy manual and the job announcement indicated that he was eligible. *See id.* He alleged that the individuals who were selected were less qualified than him. *See id.* Additionally, he identified the responsible officials as Elizabeth Lewis, Andrew Cannady, Tom Hamann, and Susan Yarwood. *See id.*

As to the second adverse action, Mr. Ellis explained that on September 3, 2021, he received a formal memorandum and was placed on administrative leave "without being afforded [his] right to due process in accordance with the USSS Table of Penalties as none of the Table of Penalties were violated or applied to [his] situation." *Id.* He asserted that the allegations against him were "false and without any merit." *Id.* Further, Mr. Ellis stated that he had "knowledge of several other similarly situated White employees who were afforded due process in accordance with the USSS Table of Penalties." *Id.* He identified the officials involved in this personnel action as Andrew Cannady, Elizabeth Lewis, Susan Yarwood, and possibly others. *See id.*

On January 16, 2022, Mr. Ellis bid for a promotion to an ATSAIC position within the Talent Acquisition Division, which was "similar to a role [he] previously held in the private sector." Am. Compl., ECF No. 7 ¶ 139. According to Mr. Ellis, Chief Yarwood prevented him from being promoted. *See id.* ¶ 147.

Mr. Ellis informed the EEO that he would file another EEO complaint against Chief Yarwood for retaliation. *See id.* "On April 1, 2022, Human Resources released an updated policy, written by Chief Yarwood and Thomas Hamann, which effectively banned Mr. Ellis from [hard-to-staff] positions by adding a minimum time commitment for Phase 2 assignments before being eligible for reassignment." *Id.* ¶ 152.

On March 2, 2022, Mr. Ellis submitted a second complaint to the USSS Office of Personnel Responsibility (Investigations) division in which he alleged retaliation by SAIC Lewis, Chief Yarwood, and Chief Watson for, among other things, filing his EEO complaint. *See id.* ¶ 145. On March 3, 2022, Mr. Ellis made similar additional complaints to the DHS OIG and Office of Special Counsel. *See id.* On March 9, 2022, Mr. Ellis told his new supervisor, ATSAIC Gleason, that he "intended to submit a memorandum to Investigations, challenging the accuracy of [] Chief Watson's MFR" about his alcoholism. *Id.* ¶ 148. Mr. Ellis submitted this challenge on March 11, 2022. *See id.* ¶ 149. On March 20, 2022, Mr. Ellis filed another complaint with the Inspections division identifying additional individuals involved in misconduct and seeking an investigation. *See id.* ¶ 150. In June 2022, Mr. Ellis made his fourth complaint to the Inspections Division, this time under the Anti-Harassment Program, and "provided a detailed overview of the discriminatory

14

harassment that he was subjected to by white and light-skinned individuals." *Id.* ¶ 154. Later in June 2022, Mr. Ellis was informed that "no action would be taken against those who discriminated against" him, in particular, Chief Yarwood. *Id.* ¶ 155. Mr. Ellis bid on a position at the James J. Rowley Training Center in July 2022 and was selected for this position. *See id.* ¶ 156.

### B. Procedural

At the conclusion of Mr. Ellis's EEO process, on May 5, 2023, the Agency issued a Final Agency Decision which found no wrongdoing. *Id.* ¶ 13. Mr. Ellis then appealed the Final Agency Decision to the Office of Federal Operations on May 26, 2023. *See id.* ¶ 14. The Office of Federal Operations issued a decision on January 8, 2024 agreeing with the Agency's determination. *See id.* ¶ 15.

Mr. Ellis timely filed his Complaint in this Court on April 5, 2024. *See* Compl., ECF No. 1. Defendant filed her first Motion to Dismiss Mr. Ellis's Complaint on July 15, 2024. *See* Def.'s Mot. to Dismiss, ECF No. 6. Mr. Ellis then filed his Amended Complaint on July 29, 2024, as well as his Opposition to the first Motion to Dismiss. *See* Am. Compl., ECF No. 7; Pl.'s Opp'n to Mot. to Dismiss, ECF No. 8. In his Amended Complaint, Mr. Ellis alleges seven counts of discrimination, retaliation, and hostile work environment on the basis of his race, color, and

15

religion, in violation of Title VII. *See* Am. Compl., ECF No. 7 at 19–23 (alleging Count I: Discrimination on the Basis of Race in violation of 42 U.S.C. § 2000e, et seq.; Count II: Discrimination on the Basis of Color in violation of 42 U.S.C. § 2000e, et seq.; Count III: Discrimination on the Basis of Religion in violation of 42 U.S.C. § 2000e, et seq.; Count IV: Retaliation in violation of 42 U.S.C. § 2000e, et seq.; Count V: Hostile Work Environment on the Basis of Race in violation of 42 U.S.C. § 2000e, et seq.; Count VI: Hostile Work Environment on the Basis of Color in violation of 42 U.S.C. § 2000e, et seq.; and Count VII: Hostile Work Environment on the Basis of Religion in violation of 42 U.S.C. § 2000e, et seq.).

Defendant subsequently filed her second Motion to Dismiss on September 26, 2024, seeking to dismiss Mr. Ellis's Amended Complaint. *See* Mot., ECF No. 10. In light of the Amended Complaint and second Motion to Dismiss, the Court issued a Minute Order finding the first Motion to Dismiss moot. *See* Minute Order (Sept. 26, 2024). Mr. Ellis filed his Opposition to the second Motion to Dismiss on October 23, 2024, *see* Opp'n, ECF No. 12; and Defendant filed her Reply on November 14, 2024, *see* Reply, ECF No. 13. The second Motion to Dismiss is now ripe for consideration.

## II.  Standard of Review

### A. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007) (internal quotation marks omitted).

Despite this liberal pleading standard, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Schl.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A claim is facially plausible when the facts pled in the complaint allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard does not amount to a "probability requirement," but it

17

does require more than a "sheer possibility that a defendant has acted unlawfully." *Id.*

"[W]hen ruling on a defendant's motion to dismiss [pursuant to Rule 12(b)(6)], a judge must accept as true all of the factual allegations contained in the complaint." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (internal quotation marks omitted). In addition, the court must give the plaintiff the "benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### B. Title VII

"Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 253-66 (codified as amended in 42 U.S.C. §§ 2000e to 2000e-17), reflects the American promise of equal opportunity in the workforce and shields employees from certain pernicious forms of discrimination." *Figueroa v. Pompeo*, 923 F.3d 1078, 1082-83 (D.C. Cir. 2019); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973) ("*McDonnell Douglas*") (citations omitted) ("The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens."). Accordingly, it is "unlawful for an employer to 'fail or refuse

18

to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin."' *Muldrow v. City of St. Louis, Missouri*, 601
U.S. 346, 354 (2024) (quoting 28 U.S.C. § 2000e-2(a)(1)).

Title VII's protections ""strike at the entire spectrum of
disparate treatment of men and women in employment,' which
includes requiring people to work in a discriminatory hostile or
abusive environment." *Harris v. Forklift Systems Inc.*, 510 U.S.
17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477
U.S. 57, 64 (1986) ("*Vinson*") (additional citations omitted)).
Accordingly, a "workplace that is permeated with 'discriminatory
intimidation, ridicule, and insult . . . that is sufficiently
severe or pervasive to alter the conditions of the victim's
employment and create an abusive working environment"' violates
Title VII as a hostile work environment claim. *Id.* (quoting
*Vinson*, 477 U.S. at 67). "A separate section of [Title VII]—its
antiretaliation provision—prohibits an employer from
'discriminating against' an employee or job applicant because
that individual 'opposed any practice' made unlawful by Title
VII or 'made a charge, testified, assisted, or participated in'
a Title VII proceeding or investigation." *Burlington Northern &
Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) ("*Burlington*")

19

(quoting 42 U.S.C. § 2000e-3(a)) (alterations omitted). Title VII's "substantive protections 'apply with equal force in both private and federal-sector cases.'" *Figueroa*, 923 F.3d at 1083 (quoting *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012)).

Title VII cases can be based on direct or circumstantial evidence. *See Figueroa*, 923 F.3d at 1086. In cases that lack direct evidence, courts apply the *McDonnell Douglas* framework wherein a plaintiff first alleges a *prima facie* case, then the employer puts forth a legitimate, non-discriminatory reason for their action, then the plaintiff must show that the proffered reason is pretext for discrimination. *McDonnell Douglas Corp*, 411 U.S. at 802-06. The *McDonnell Douglas* framework only comes into play, however, *after* the pleading stage. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) ("The prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement.").

## III. Analysis

### A. Exhaustion

"Before filing suit, Title VII plaintiffs must timely exhaust their administrative remedies." *Harris v. Gonzales*, 488 F.3d 442, 443 (D.C. Cir. 2007) (citing 42 U.S.C. § 2000e-16(c)). According to Equal Employment Opportunity Commission ("EEOC") regulations, a Title VII plaintiff must initiate contact with an

Equal Employment Opportunity ("EEO") officer within forty-five days of an alleged discriminatory or retaliatory event. *See id.*

For purposes of the Court's exhaustion analysis, the Court delineates three overarching categories of unlawful conduct alleged in the Amended Complaint: (1) events pre-August 6, 2021, which is forty-five days prior to his informal EEO complaint on September 20, 2021; (2) events included in Mr. Ellis's EEO complaint and subsequent documents in his EEO process; and (3) events that occurred after Mr. Ellis began his EEO process for which Mr. Ellis did not supplement his EEO documents. *See generally* Am. Compl., ECF No. 7. Defendant does not contest that the second category of events, those listed in Mr. Ellis's EEO complaint and subsequent documents, is properly exhausted. *See* Mot., ECF No. 10 at 22-23. Accordingly, the Court will not analyze Defendants' arguments with respect to the merits of those events. Defendant asserts, however, that the events in the first and third categories, those pre-August 6, 2021 events and post-EEO complaint not included in agency documents, are not exhausted and therefore must be dismissed. *See id.*

The Court agrees that the events that occurred prior to August 6, 2021 cannot give rise to Mr. Ellis's discrete Title VII discrimination and retaliation claims because they were not exhausted. Mr. Ellis concedes this point and clarifies that those events contribute to his hostile work environment claims,

21

not his discrete discrimination and retaliation claims. *See* Opp'n, ECF No. 12 at 9. Likewise, the events that Defendants assert occurred after the filing of Mr. Ellis's informal EEO complaint, category three, and were not subsequently addressed in his EEO process will be dismissed with respect to Mr. Ellis's discrete Title VII retaliation and discrimination claims. Mr. Ellis does not contest that these events were un-exhausted, nor assert that any exception to exhaustion applies.

Accordingly, the events that were properly exhausted for purposes of Mr. Ellis's discrete discrimination and retaliation claims are: (1) Mr. Ellis's August 6, 2021 disqualification from hard-to-staff job opportunity announcements; (2) Mr. Ellis's September 3, 2021 receipt of a formal memorandum and placement on administrative leave without being afforded the right to due process; (3) Mr. Ellis's supervisors' treatment of the protectee complaint and requirement that Mr. Ellis write a memo about the incident; (4) false statements about Mr. Ellis's supposed alcoholism; (5) Mr. Ellis's non-selection for Job Opportunity 22039 on March 3, 2022; and (6) Mr. Ellis's non-selection for the Job Opportunity Spr22-HTS-01, Special Agent, GS-13, Office of Training, James J. Rowley Training Center on May 5, 2022. *See generally* Am. Compl., ECF No. 7; Def. Ex. 5, ECF No. 10-6 at 6 (Formal EEO Complaint); Def. Ex. 6, ECF No. 10-7 at 2-3 (Notice of Acceptance Letter); Def. Ex. 7, ECF No. 10-8 at 2-3 (Amended

Notice of Acceptance Letter); Def. Ex. 8, ECF No. 10-9 at 2-3
(Second Notice of Acceptance Letter).

Beyond this straight-forward application of the exhaustion
requirement for Title VII discrimination and retaliation claims,
Defendant also asserts that Mr. Ellis's Hostile Work Environment
claims should be dismissed on exhaustion grounds for events that
occurred prior to 2021. Mr. Ellis responds, however, that
Defendant misconstrues his Amended Complaint and that he has
alleged one continuous hostile work environment from 2011
through 2022, and that events that contributed to this claim
were exhausted in his 2021 EEO process. For the reasons
explained below, the Court agrees with Mr. Ellis and will not
dismiss or limit the bases for his hostile work environment
claim on exhaustion grounds.

The Supreme Court has made clear that a "charge alleging a
hostile work environment claim . . . will not be time barred so
long as all acts which constitute the claim are part of the same
unlawful employment practice and at least one act falls within
the time period." *National R.R. Passenger Corp. v. Morgan*, 536
U.S. 101, 122 (2002). Therefore, for purposes of exhaustion,
acts that occur prior to the filing of an administrative
complaint can constitute part of a hostile work environment
claim if at least one of the events occurred in the exhaustion
period. *See id.* at 118 ("In order for the charge to be timely,

the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment."). Moreover, the act for which a plaintiff timely notifies the EEO office "need not . . . be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has 'occurred,' even if it is still occurring." *Id.*

Defendant concedes as much, *see* Mot., ECF No. 10 at 21 (quoting *Morgan*, 536 U.S. at 117); but asserts that "this rule does not apply to acts that occur prior to the filing of an EEO complaint." *Id.* (citing *Wilson v. Clayton*, 272 F. Supp. 3d 25, 33 (D.D.C. 2017) (internal citation & parenthetical omitted); *Foxworth v. McDonough*, Civ. A. No. 23-2195 (TNM), 2024 WL 111761, at *5 (D.D.C. Jan. 10, 2024) (parenthetical omitted). Defendant does not elaborate on the argument, rather, she addresses pre-2021 exhaustion for Mr. Ellis's hostile work environment claims with her arguments about some of Mr. Ellis's discrete retaliation and discrimination claims being unexhausted. *See id.*[4] Moreover, the cases she cites consider when allegations can be sufficiently like or related to be deemed as exhausted when they otherwise would not be. *See id.*

---

[4] In Reply, Defendant primarily attempts to distinguish Mr. Ellis's authority by raising similar arguments about the asserted lack of relatedness or time gaps in the alleged instances. *See* Reply, ECF No. 13 at 9-10.

Mr. Ellis does not allege that this exception applies to any pre-2021 events; rather, he maintains that he has alleged a continuous hostile work environment from 2011-2022, during which time at least some of the events at issue were exhausted. Accordingly, taking Mr. Ellis's allegations as true, he has sufficiently alleged that he has exhausted his hostile work environment claims. To the extent Defendant challenges whether the pre-2021 events are sufficiently related to events in 2021 that Mr. Ellis properly exhausted such that they can be considered as part of his hostile work environment claim, *see* Reply, ECF No. 13 at 10; the Court will consider this issue when it addresses whether his hostile work environment claims were plausibly alleged.

### B. Discrimination and Retaliation Claims

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The *prima facie* elements for a discrimination claim are (1) membership in a protected class; (2) adverse action; and (3) inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. For retaliation cases, the *prima facie* elements are (1) protected activity; (2) adverse action; and (3) causal connection for retaliation claims. *See Hussain v. Nicholson,* 435 F.3d 359, 366 (D.C. Cir. 2006).

"At the pleading stage, [however,] a Title VII plaintiff need not even allege a prima facie case." *Chambers v. District of Columbia*, 35 F.4th 870, 903 (D.C. Cir. 2022) (citing *Swierkiewicz*, 534 U.S. at 515). Indeed, the Supreme Court has made clear that a Title VII suit imposes no higher burden on a plaintiff than ordinarily arises for a motion to dismiss. *See also Swierkiewicz*, 534 U.S. at 511. Accordingly, "[a]t the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case." *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (citing *Swierkiewicz*, 534 U.S. at 510–11).

As noted, the exhausted actions for Mr. Ellis's Title VII Discrimination and Retaliation claims are: (1) Mr. Ellis's August 6, 2021 disqualification from a hard-to-staff job opportunity announcement; (2) Mr. Ellis's September 3, 2021 receipt of a formal memorandum and placement on administrative leave without being afforded the right to due process; (3) Mr. Ellis's supervisors' treatment of the protectee complaint and requirement that Mr. Ellis write a memo about the incident; (4) false statements about Mr. Ellis's supposed alcoholism; (5) Mr. Ellis's non-selection for Job Opportunity 22039 on March 3, 2022; and (6) Mr. Ellis's non-selection for the Job Opportunity Spr22-HTS-01, Special Agent, GS-13, Office of Training, James J.

Rowley Training Center on May 5, 2022. *See generally* Am. Compl.,
ECF No. 7; Def. Ex. 5, ECF No. 10-6 at 6 (Formal EEO Complaint);
Def. Ex. 6, ECF No. 10-7 at 2-3 (Notice of Acceptance Letter);
Def. Ex. 7, ECF No. 10-8 at 2-3 (Amended Notice of Acceptance
Letter); Def. Ex. 8, ECF No. 10-9 at 2-3 (Second Notice of
Acceptance Letter). Defendant seeks dismissal of these claims on
several bases, each of which the Court discusses below.

Before the Court addresses these specific arguments, it is
worth noting two overarching issues. First, Defendant attempts a
selective reading of Mr. Ellis's Amended Complaint by asserting
that he has forfeited or limited his claims by enumerating
certain allegations while excluding others in the claims
themselves. *See e.g.*, Reply, ECF No. 13 at 11 (asserting that
Mr. Ellis never alleged that his administrative leave, false
alcoholism allegations, and issues related to the protectee's
complaint were part of his retaliation claim); *id.* at 17
(asserting that Mr. Ellis's Amended Complaint "specifically
alleged that he first engaged in protected activity on September
20, 2021"). This argument is unpersuasive as Mr. Ellis expressly
incorporated all of his allegations into each of his counts. *See*
Am. Compl., ECF No. 7 ¶¶ 158, 163, 168, 173, 179, 184, 189.

Moreover, for many the instances in which Mr. Ellis
enumerated certain events as elements of his claims in addition
to the foregoing paragraphs that he reincorporated, he made

27

clear the list was non-exhaustive. *See e.g. id.* ¶ 159 (listing events "*inter alia*" that were unlawful discrimination). If there were doubt about the breadth of Mr. Ellis's allegations, the Court would resolve those in his favor given the requirements for considering a motion to dismiss. *See Kowal*, 16 F.3d at 1276. Accordingly, the Court rejects Defendant's arguments that Mr. Ellis has limited certain counts to exclude allegations listed in his Amended Complaint. *See also Bynum v. District of Columbia*, 424 F. Supp. 3d 122, 131 (D.D.C. 2020) (rejecting similar argument).

Second, Defendant raises numerous arguments about issues that Mr. Ellis has purportedly conceded. *See* Mot, ECF No. 10 at 39; Reply, ECF No. 13 at 8-9. Some of these arguments are persuasive, but others fail upon closer consideration. The Court will address these arguments to the extent they are relevant to its analysis.

### 1. Adverse Action

Defendant argues that much of the unlawful conduct in Mr. Ellis's Amended Complaint does not rise to the level of adverse action. *See generally* Mot., ECF No. 10 at 24-38.[5] With respect

---

[5] Mr. Ellis asserts that Defendant concedes that some of the unlawful conduct rises to the level of adverse action. *See* Opp'n, ECF No. 12 at 15. Defendant claims that her failure to address certain allegations was based on her view that certain allegations were excluded from Mr. Ellis's claims. *See* Reply, ECF No. 13 at 16.

to adverse action for discrimination, she asks the Court to impose a higher standard than the Supreme Court recently articulated in *Muldrow v. City of Saint Lewis* because this case involves a federal as opposed to private or local governmental employee. *See id.* As discussed below, this theory has been rejected by every judge on this Court to have considered it. With respect to retaliation, Defendant acknowledges that the standard is more generous, but asserts that many of the events still do not meet it. *See id.* Mr. Ellis argues that this Court should reject the government's argument with respect to the standard for adverse action in government-employee discrimination cases, and that he has sufficiently alleged adverse action for both his retaliation and discrimination claims. *See* Opp'n, ECF No. 12 at 13–15.

The Court will first determine the applicable legal standards, then it will evaluate the specific adverse actions.

### a. Legal Standards

#### i. Discrimination

In *Muldrow v. City of Saint Louis*, the Supreme Court made clear that to show an adverse action for a discrimination claim under Title VII, a plaintiff need only allege that the action caused "some harm" to a term or condition of their employment. *Muldrow v. City of St Louis*, 601 U.S. 346, 354-55 (2024). In so ruling, the Supreme Court settled a dispute among United States

Courts of Appeal as to what amount of harm a Title VII plaintiff must allege, with many such courts imposing a "significant" harm requirement that resulted in keeping numerous plaintiffs out of court. *See id.* at 355-56 (detailing examples where "employees suffered some injury in their employment terms or conditions (allegedly because of race or sex)" but "[t]heir claims were rejected solely because courts rewrote Title VII, compelling workers to make a showing that the statutory text does not require").

To avoid the application of *Muldrow* here, Defendant puts forth a limiting interpretation that has no basis in *Muldrow*, no support in D.C. Circuit precedent, and that every other judge on this Court who has considered the argument has rejected. *See* Mot., ECF No. 10 at 26-29. Specifically, Defendant asserts that because language in Title VII cases for federal employees differs from non-federal and local employees, the "some harm" standard set forth in *Muldrow* does not apply to the former category of cases, such as here. *See id.* 26-27. This argument is without merit.

Defendant's only source of authority for her argument is that the Supreme Court held in *Babb v. Wilkie* that the difference in language in federal and non-federal protections under the Age Discrimination in Employment Act ("ADEA")-which is comparable to that in the Title VII context-carried legal

30

significance. *See Babb v. Wilkie*, 589 U.S. 399, 405 (2020).
Defendant cites to no authority that has held that different
standards govern federal and non-federal employee cases in the
Title VII discrimination context. On the contrary, as Defendant
concedes, the D.C. Circuit has previously held that the federal
and non-federal employee provisions of Title VII provide the
same protections to those who allege they have suffered
discrimination. *See* Mot., ECF No. 10 at 29 (discussing how other
judges on this Court have continued to apply *Czekalski v.
Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), which held that the
federal employee protections in Title VII discrimination cases
are the same as non-federal employee protections). Even so,
Defendant seeks a broad application of *Babb* beyond the ADEA
context to mean that "when anti-discrimination statutes use
different language in their federal and non-federal provisions
they should not be interpreted the same." *Id.* at 29.

The Court agrees with its colleagues that this argument is
without merit. *See e.g.*, *Wilson v. Noem*, No. 20-CV-100 (GMH),
2025 WL 1000666, at *20 (D.D.C. Apr. 3, 2025)*; Turner v.
Buttigieg*, No. CV 23-1665 (LLA), 2024 WL 4346332, at *8 (D.D.C.
Sept. 30, 2024); *Hollingsworth v. Vilsack*, No. CV 23-2427 (LLA),
2024 WL 4332118, at *9 (D.D.C. Sept. 27, 2024), *appeal dismissed
sub nom. Hollingsworth v. Rollins*, No. 24-5267, 2025 WL 1457915
(D.C. Cir. May 14, 2025); *Mitchell v. Garland*, No. CV 23-2412

(LLA), 2024 WL 3251217, at *3 (D.D.C. July 1, 2024). As other judges on this Court have recognized, even though the D.C. Circuit has not directly addressed this issue, it has continued post-*Babb* to consider the federal and non-federal employee provisions in Title VII discrimination claims coextensively. *See also Mitchell*, 2024 WL 3251217, at *3; *Bain v. Off. Of the Att'y Gen.*, 648 F. Supp. 3d 19, 54 (D.D.C. 2022). In 2022, in a non-federal employee case, the D.C. Circuit overruled the heightened standard set forth in *Brown v. Brody*, 199 F.3d 446, 447 (D.C. Cir. 1999), which was a federal employee case that required a showing of "objectively tangible harm" in alleged discriminatory transfers. *See Chambers*, 35 F.4th at 873. Nowhere in *Chambers* did the D.C. Circuit imply there was a difference in federal versus non-federal Title VII discrimination cases nor cast doubt on its prior holdings that these protections were coterminous. *See id.* Accordingly, the Court will apply the "some harm" standard that the Supreme Court articulated in *Muldrow*.

### ii. Retaliation

Unlike Title VII discrimination claims, a plaintiff need not show that an alleged retaliatory action impacts a term or condition of their employment. Rather, the Supreme Court has explained that retaliation is broadly defined to mean any action against the employee that would dissuade an objective employee from reporting unlawful discrimination. *See Burlington*, 548 U.S.

at 68-70. Indeed, the Supreme Court explained that "Title VII
depends for its enforcement upon the cooperation of employees
who are willing to file complaints and act as witnesses." *Id.* at
67. As such, "[i]nterpreting the antiretaliation provision to
provide broad protection from retaliation helps ensure the
cooperation upon which accomplishment of the Act's primary
objective depends." *Id.*

The Supreme Court has, however, distinguished "significant
from trivial harms" by imposing the "material adversity"
requirement. *See id.* at 68. In other words, not all retaliatory
acts will cause harm that would prevent an objective employee
from reporting discrimination. *See id.* The question of material
adversity depends on the context and circumstances of the
events. *See id.* at 69 (quoting *Oncale v. Sundowner Offshore
Servs. Inc.*, 523 U.S. 75, 81-82 (1998) ("'The real social impact
of workplace behavior often depends on a constellation of
surrounding circumstances, expectations, and relationships which
are not fully captured by a simple recitation of the words used
or physical acts performed."')).

### b. Specific Adverse Actions

Defendant challenges Mr. Ellis's claimed instances of
discrimination or retaliation as failing to constitute adverse
actions. Several of the arguments go beyond what Mr. Ellis
asserts to be relevant adverse actions, so the Court will not

address these issues.[6] Instead, the Court will focus on the
discrete events that Mr. Ellis maintains comprise his
discrimination and retaliation claims. These are also the
instances that he exhausted according to the EEO documents that
Defendant attached to her Motion, albeit with slightly different
descriptions. The relevant events, per Mr. Ellis, are: (1) his
wrongful disqualification from two hard-to-staff positions in
August 2021; (2) the "false allegations of alcoholism, [which]
damage[ed] his reputation [and led] to administrative leave";
(3) the Agency's "[b]lowing an incident with a protectee
'Cowboy' out of proportion," and requirement for him to write
the "humiliating memo documenting the non-incident"; and (4) the
denial of a promotion to the Talent Acquisition Division ATSAIC
position on January 16, 2022.[7] *See also* Opp'n, ECF No. 12 at 14
(citing Am. Compl. ¶¶ 48, 71, 84, 113, 114, 139, 152).

---

[6] To the extent that these allegations are part of Mr. Ellis's
discrete discrimination or retaliation claims, which he states
they are not, Defendant's Motion to Dismiss is granted and these
claims are dismissed.

[7] Mr. Ellis did not include the allegation in his EEO documents
about his May 2022 non-selection for the Job Opportunity Spr22-
HTS-01, Special Agent, GS-13, Office of Training, James J.
Rowley Training Center in this summary, *see* Def. Ex. 8, ECF No.
10-9 at 2, so the Court will not consider it as part of the
instances Mr. Ellis maintains are discrete discriminatory or
retaliatory events. To the extent it is one of his discrete
claims, Defendant's Motion to Dismiss is granted and that claim
is dismissed.

### i. Disqualification

Defendant does not address in her Motion whether Mr. Ellis's disqualification from hard-to-staff positions was an adverse action. *See* Mot., ECF No. 10. As noted, the Court rejects Defendant's argument that Mr. Ellis has not alleged this as a discrete incident of discrimination and retaliation simply because he did not re-allege this incident by name in specific counts. *Cf* Reply, ECF No. 13 at 16. But it also does not agree with Mr. Ellis that Defendant concedes this was sufficient adverse action by failing to address it in her Motion. *Cf* Opp'n, ECF No. 12 at 15. Nonetheless, the only arguments with respect to the disqualification that Defendant raises in her Reply relate to whether Mr. Ellis has alleged retaliatory motive. *See generally* Reply, ECF No. 13 at 16-22. Accordingly, Defendant has suggested no basis for the Court to dismiss these discrete allegations related to adverse action.

### ii. False Accusations of Alcoholism and Administrative Leave

Defendant raises several arguments as to why the Agency's false allegations of alcoholism and placement of Mr. Ellis on administrative leave are not adverse actions. *See* Mot., ECF No. 10 at 31-34. For the reasons discussed below, these arguments fail.

With respect to discrimination, Defendant bases her argument on the higher, non-*Muldrow* standard and argues that Mr. Ellis has not alleged a qualifying "personnel action" or other "significant" change to his duties or responsibilities. *Id.* at 32. Defendant made no argument as to whether, if the Court rejected her argument on the applicable standard, these actions would still not meet the level of "some harm." *See id.; see also* Reply, ECF No. 13. Specifically, for the administrative leave issue, Defendant maintains that Mr. Ellis failed to show "significant" harm and repeatedly highlights how Mr. Ellis continued to be paid throughout his administrative leave. *See* Mot., ECF No. 10 at 32. *See id.* Beyond not requiring plaintiffs like Mr. Ellis to show significant harm, the Supreme Court reaffirmed in *Muldrow* that actionable harm extends beyond economic or tangible harms. *See Muldrow*, 601 U.S. at 354 (citations omitted). Here, Mr. Ellis has plausibly alleged that he suffered some harm as he was placed on administrative leave from duty based on false accusations regarding his fitness for duty.

As for the false accusations of alcoholism and issuance of the memorandum, Defendant only addresses these allegations with respect to discrimination in her Reply. *See* Reply, ECF No. 13 at 13; *see also* Mot. at 33-34 (focusing on retaliation). *See* Mot., ECF No. 10; Reply, ECF No. 13. Defendant maintains that *Muldrow*

does not apply and argues that "reputational harm is not a recognized harm for purposes of . . . discrimination[.]" Reply, ECF No. 13 at 13 (citing, with respect to discrimination, *Chambers*, 35 F.4th at 874 ("[N]ot everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment[.]" (alterations in original)). Even if Mr. Ellis has only alleged reputational harm, the D.C. Circuit cast doubt in *Chambers* as to whether such harm would be insufficient as it is more than *de minimis*. *See Chambers*, 35 F.4th at 875 (considering how under the prior, more restrictive *Brown* standard, "public humiliation or loss of reputation" were deemed insufficient despite being more than "de minimis").

Here, however, Mr. Ellis has alleged additional harm by asserting that these allegations affected his "potential for new assignments." *See* Opp'n, ECF No. 12 at 15; *see also id.* (explaining how in his job as a Secret Service Special Agent, "mental acuity and fitness for duty are paramount"). In Reply, Defendant casts doubt on these allegations and highlights how Mr. Ellis ultimately obtained the position at the James J. Rowley Training Center that he had wanted. *See* Reply, ECF No. 13 at 13. She also asserts that Mr. Ellis's allegations of future negative impact on his career are too speculative. *See id.* But the Court continues to take Mr. Ellis's plausible factual allegations as true and notes that Mr. Ellis alleged he was

denied at least one promotion in the time between when the false
allegations occurred and when he ultimately obtained the job
that Defendant cites. *See* Am. Compl. ¶¶ 139, 159. Accordingly,
the Court need not decide whether purely reputational harm would
be actionable as it is sufficient to conclude that Defendant
failed to show Mr. Ellis's allegations here fall below the "some
harm" standard that applies.

As to retaliation, Defendant bases much of her argument on
the assumption that Mr. Ellis was placed on leave pending an
investigation, that the false alcoholism accusations and
memorandum arose as part of an investigation, and that these
instances were simply ways in which Mr. Ellis was subjected to
heightened scrutiny related to his job. *See* Mot., ECF No. 10 at
32-34. These assumptions are unsupported. Mr. Ellis lays out how
the Agency nominally placed him on administrative leave so that
they could conduct an investigation into his alleged alcoholism
and fitness for duty. *See* Am. Compl., ECF No. 7 ¶¶ 6
(administrative leave purportedly being so that Agency could
conduct an investigation), 88 (placement on leave pending an
"FFD", or fitness for duty), 95 (alleging Mr. Ellis was placed
on administrative leave due to his "alcohol dependency" and to
"undergo an alcohol treatment"). But no such investigation ever
occurred. *See id.* ¶¶ 7 (the Agency never conducted such an
investigation), 123 (Safety and Health office had no records of

Mr. Ellis being referred for any evaluation), 124 (same), 125 (reinstating Mr. Ellis despite receiving no FFD evaluation).

Moreover, Mr. Ellis alleges that when a superior asked if he would '"put this behind' him", referring to the alcoholism accusations and administrative leave, Mr. Ellis "replied that he wanted an investigation" but was told, *inter alia*, to '"stop beating a dead horse."' *Id.* ¶ 126. Therefore, taking Mr. Ellis's facts as true, not only did the Agency fail to conduct any investigation into its accusations of alcoholism that were the proffered reason for Mr. Ellis's administrative leave, but it also hindered his efforts to disprove these accusations. Accordingly, Defendant's bases for her arguments that these allegations are not adverse actions for purposes of retaliation fails.[8]

_____

[8] Even though the Court rejects the premise of Defendant's argument, it is worth noting that the cases Defendant cites fall far short of showing that "there is a near consensus" among other judges on this Court that "paid administrative leave pending an investigation" does not constitute adverse action for retaliation. Mot., ECF No. 10 at 32 (citations omitted). As Defendant concedes, the D.C. Circuit has not ruled definitively on this question. *see id.* at 32 (citing *Hornsby v. Watt*, No. 17-5001, 2017 WL 11687516, at *1 (D.C. Cir. Nov. 14, 2017)). Although in all of the cases that Defendant cites, other judges have held that administrative leave was insufficient to show adverse action, many of the cases were based on individualized analyses of the facts of that specific case, including the investigation that was initiated. *See Wesley v. Georgetown Univ.*, Civ. A. No. 18-1539 (BAH), 2018 WL 5777396, at *6 (D.D.C. Nov. 2, 2018); *Jones v. Castro*, 168 F. Supp. 3d 169, 179 (D.D.C. 2016) (parenthetical omitted); *Hunter*, 905 F. Supp. 2d at 374; *Hunter v. District of Columbia*, 905 F. Supp. 2d 364, 374 (D.D.C.

### iii. Incident with Protectee

The arguments with respect to the Agency's requirement that Mr. Ellis write a memorandum about the incident with the protectee, "Cowboy," largely overlap with those related to the false alcoholism allegations and administrative leave discussed above. With respect to discrimination, Defendant applies the heightened non-*Muldrow* standard and asserts that Mr. Ellis has failed to show a "significant change to his duties, responsibilities, or working conditions by being asked to write a memorandum" about this incident. *See id.* at 35. Mr. Ellis articulates a similar impact from these incidents related to his credibility and potential for new assignments as the false alcoholism accusations. *See* Opp'n, ECF No. 12 at 15. Again, Defendant fails to address this argument under the *Muldrow* standard of "some harm." The Court therefore rejects her argument.

With respect to retaliation, Defendant again argues that Mr. Ellis's allegations "amount to a complaint that the Secret Service initiated an investigation into a protectee's complaint about him or was otherwise imposing scrutiny on his work . . .

---

2012) aff'd, No. 13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013)). This approach is in line with the Supreme Court's guidance that whether an action is materially adverse depends on the facts and circumstances of that case. *See Burlington*, 548 U.S. at 69.

." Mot., ECF No. 10 at 34-35. Defendant reiterates her argument that "the mere initiation of an investigation does not amount to materially adverse action for purposes of retaliation, unless the investigation triggers disciplinary action." *Id.*[9] The Court rejects these arguments for the same reasons as explained above. Accordingly, Defendant has failed to show that Mr. Ellis's allegations with respect to the protectee's complaint and the requirement that he write a memorandum on this incident are insufficient adverse actions.

### iv.  Denial of Promotion

Neither party spends much time discussing whether the denial of promotions constitutes adverse action against Mr. Ellis. Defendant generally asserts that Mr. Ellis's allegation that the Agency announced a new policy on April 1, 2022 that effectively banned him from hard-to-staff positions is "mere speculation", which is not actionable. Mot., ECF No. 10 at 36-37. In response, Mr. Ellis reiterates that he alleges adverse action based on the denial of his promotion. *See* Opp'n, ECF No. 12 at 14 (citing Am. Compl., ECF No. 7 ¶¶ 139, 152). The

---

[9] Defendant also discusses how there is no basis to allege that Mr. Ellis was placed on administrative leave as a result of having to write this memorandum. *See* Mot., ECF No. 10 at 35. The Court need not base its conclusion here on an assumption that this action led to Mr. Ellis's administrative leave, even though he has alleged so in his Amended Complaint. *See* Am. Compl., ECF No. 7 ¶ 116.

allegations that Mr. Ellis cites include both his bid for a

"promotion to ATSAIC within the Talent Acquisition Division",

which was similar to a role he previously held in the private

sector, *see* Am. Compl., ECF No. 7 ¶ 139; and the release of an

updated policy which effectively banned Mr. Ellis from HTS

positions by adding a minimum time commitment for Phase 2

assignments before being eligible for reassignment", *id.* ¶ 152.

Defendant does not argue that if Mr. Ellis were denied a

promotion, that would be adverse action. Defendant only

addresses the non-promotion further in Reply when she argues it

is too speculative for other aspects of a *prima facie* case of

retaliation. *See* Reply, ECF No. 13 at 24. Accordingly, Defendant

has not shown that Mr. Ellis insufficiently alleged it to be

adverse action.

### c. Protected Activity and Causal Nexus

The D.C. Circuit has described how at the pleading stage,

"th[e] initial burden" to plausibly allege a case of retaliation

"is not great." *McKenna v. Weinberger*, 729 F.3d 783, 790 (D.C.

Cir. 1984). A "[p]laintiff merely needs to establish facts to

permit an inference of retaliatory motive." *Id.* "An employee's

opposition to an employment practice is protected under Title

VII when the employee 'reasonably and in good faith believed

[the practice] was unlawful under the statute.'" *Grosdidier v.

Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir.

2013) (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)); *see also Lott v. Not-for-Profit Hosp. Corp.*, 319 F. Supp. 3d 277, 282 (D.D.C. 2018) ("The employee's 'belief' that the employer's conduct was unlawful need not be certain."). "A plaintiff may satisfy this third element of a prima facie case by showing 'the employer had knowledge of the employee's protected activity, and ... the adverse personnel action took place shortly after that activity.'" *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)).

Defendant raises two main arguments for why the Court should dismiss Mr. Ellis's retaliation claims for failure to allege protected activity and causal nexus. *See* Mot., ECF No. 10 at 39-47. First, Defendant argues that Mr. Ellis "concedes that the first time he engaged in any protected activity was on September 20, 2021, when he filed an informal EEO Complaint" and therefore, any alleged actions prior to then or stemming from employment decisions prior to that date are not adequately alleged to be because of his protected activity. *Id.* (citing Am. Compl., ECF No. 7 ¶ 174). This argument implicates Mr. Ellis's allegations that his non-selection for the hard-to-staff positions, false allegations of alcoholism and administrative leave, and issues related to the protectee's complaint were retaliatory. Second, Defendant asserts that several of Mr.

Ellis's allegations are "impermissible conclusory assertions."
*Id.* The only one of these latter actions that Mr. Ellis
continues to assert is a basis for his retaliation claim, and
that the Court will address, is his non-promotion.

### d. Onset of Protected Activity

Defendant asserts that Mr. Ellis "conceded" his first
instance of protected activity was his September 20, 2021
informal EEO complaint. *See* Mot., ECF No. 10 at 39-41[10]. Mr.
Ellis, however, strongly disputes this assertion. Indeed,
nowhere in the Amended Complaint does he say as much, and he
incorporated all of his allegations in his Amended Complaint to
his specific retaliation count. *See* Am. Compl., ECF No. 7 ¶ 173;
*see also id.* ¶ 174 (including no statement that any of these
were the "first" instance of protected activity); Mot., ECF No.
10 at 39.[11] In Reply, Defendant doubles down on her argument
that Mr. Ellis limited his protected activity to the post-
September 2021 EEO complaint. In addition to the reasons
explained above why the Court rejects this argument, Defendant's

_____

[10] Defendant cites no authority for the proposition that a Court
must construe a complaint that lists certain instances of
elements of a claim as excluding all other allegations in the
complaint that could be relevant to the claim, especially when
the plaintiff expressly incorporates all prior allegations.
[11] In Reply, Defendant goes as far as to assert that Mr. Ellis
"unambiguous[ly] alleg[ed] in the Amended Complaint that he
first engaged in protected activity when he filed his EEO claim
on September 20, 2021." Reply, ECF No. 13 at 18.

argument would require the Court to construe the facts against
Mr. Ellis, which it cannot do when reviewing a Motion to
Dismiss. Additionally, Defendant asserts that the instances of
protected activity Mr. Ellis alleges prior to the relevant
adverse actions either do not rise to the level of protected
activity or lack a causal connection to the retaliatory acts.
*See* Reply, ECF No. 13 at 18-23.

Mr. Ellis's Amended Complaint contains numerous instances
prior to September 20, 2021 in which he raised concerns of
discrimination and retaliation to various agency officials. *See*
Am. Compl., ECF No. 7 ¶¶ 35, 36, 72, 75, 76, 79, 118, 119, 126.
Indeed, Mr. Ellis explains how he "alleges that he engaged in
protected activity by complaining [of] racial discrimination and
a hostile work environment on the basis of race, color, and
perceived religion for years prior to July 2021[.]" Opp'n, ECF
No. 12 at 16 (citing Am. Compl., ECF No. 7 ¶¶ 1-41). Setting
aside some of the other instances of protected activity in which
Mr. Ellis engaged, such as his various informal and formal
grievances-some of which Defendant disputes-he highlights his
complaints to Chief Watson as relevant protected activity for
the pre-September 20, 2021 adverse actions in question.
According to Mr. Ellis, on August 31, 2021, he "explicitly
complain[ed] to Chief Watson that he believed his
disqualification from the two hard-to-staff positions was

discriminatory." *Id.* (citing Am. Compl., ECF No. 7 ¶ 79). Per
Mr. Ellis, "Chief Watson responded by falsely alleging that Mr.
Ellis was an alcoholic (Am. Compl. ¶ ¶¶ 83-84), placing him on
administrative leave (Am. Compl. ¶¶ 85, 88, 95), and then
humiliating Mr. Ellis by making him write a memorandum for the
record about a non-incident involving protectee "Cowboy" (Am.
Compl. ¶¶ 86, 88, 95)." *Id.* Mr. Ellis argues that the temporal
proximity between his complaints to Chief Watson and the
Agency's subsequent adverse actions is "striking, and clearly
sufficient to permit an inference of retaliatory motive." *Id.* at
16-17 (citing *e.g., Brownfield v. Bair*, 541 F. Supp. 2d 35, 45
(D.D.C. 2008) ("finding that less than two months between
protected activity and adverse action was sufficient to
establish a causal connection"); *Goos v. Nat'l Ass'n of
Realtors*, 715 F. Supp. 2, 4 (D.D.C. 1989) ("finding that just
over five weeks between the protected action and the plaintiff's
termination was short enough time lapse to infer a causal
connection")).

Mr. Ellis also alleges that after he raised concerns about
these actions in his EEOC complaint and the EEOC investigation
began, Chief Yarwood and the Agency denied Mr. Ellis the
promotion to ATSAIC within the Talent Acquisition Division that
he bid for on January 16, 2022 and that Ms. Yarwood released the
policy apparently aimed at Mr. Ellis on April 1, 2022 that

effectively banned him from hard-to-staff positions. *Id.* at 17

(citing Am. Compl., ECF No. 7 ¶¶ 133, 134, 136, 139, 147, 152.

The Court agrees with Mr. Ellis that he has sufficiently

alleged that he engaged in protected activity prior to the false

accusations of alcoholism, memorandum, administrative leave,

treatment of the incident with a protectee, and non-selection

and policy change in 2022, and that there is an inference of

retaliation for these actions. Defendant asserts that Mr.

Ellis's conversation with Chief Watson on August 31, 2021 was

merely a complaint of '"frustrated ambition' about the general

trajectory of his career" that is not sufficient protected

activity. Reply, ECF No. 13 at 21 (quoting *Broderick*, 437 F.3d

at 1232). This argument fails. The context of this conversation

was that on August 9, 2021, Mr. Ellis filed an Informal

Grievance with USSS Employee Relations Division to appeal his

disqualification from the hard-to-staff positions, *see* Am.

Compl., ECF No. 7 ¶ 75; Chief Watson called Mr. Ellis on August

31, 2021 and informed him that his complaint was being

reassigned, *see id.* ¶ 77; and during that conversation, "Mr.

Ellis explained his insistence on an unbiased grievance official

and expressed frustration at the barriers that racial

discrimination had placed in the path of his career. He joked

that his career 'drove [him] to drink[,]"' *id.* ¶ 76. Evidently,

Mr. Ellis was not simply expressing frustration at his career

47

ambition, but was raising concerns that his career had already been and was continuing to be negatively impacted by discrimination. *See id.*

Defendant concedes that a short temporal proximity can give rise to an inference of retaliation. *See* Reply, ECF No. 13 at 18-19 (citations omitted). But she asserts that Mr. Ellis has not shown that Chief Watson was involved in any of the relevant retaliatory acts. *See id.* at 22. This argument also fails. Mr. Ellis states that "[a]fter conferring with SAIC Lewis, HUM Chief Yarwood instructed PRF Division Chief Watson to create a memorandum for record . . . documenting her conversation with Mr. Ellis on August 31, 2021." Am. Compl., ECF No. 7 ¶ 83. This is the memorandum that contained the false allegations of alcoholism that, according to Mr. Ellis, led to his administrative leave and negatively impacted his potential for future assignments. *See id.* ¶ 84; Opp'n, ECF No. 12 at 15. Mr. Ellis alleges that Chief Yarwood sent the memorandum to Chief Yarwood, "who in turn forwarded it to LEG", the Legal Division. Am. Compl., ECF No. 7 ¶ 85. Mr. Ellis alleges that Chief Yarwood recommended placing Mr. Ellis on administrative leave, *see* Am. Compl., ECF No. 7 ¶ 86; and that one of the individuals who was involved in the discussions leading to Mr. Ellis's administrative leave, "DAD Wilson", even raised questions as to

whether the decision was "based on Mr. Ellis' efforts to get a different assignment," *id.* ¶ 90.

Mr. Ellis has similarly sufficiently alleged that he complained of being "wrongly disqualified" from hard-to-staff positions to ATSAIC Iosilevich around August 6, 2021, *see* Am. Compl., ECF No. 7 ¶ 72; and that on September 3, 2021, ATSAIC Iosilevich "instructed Mr. Ellis to write a memorandum detailing his interaction with 'Cowboy' and her friends, and to submit it with his request for reinstatement, *see id.* ¶ 113. *See also id.* ¶ 114 (instructing Mr. Ellis to omit details that could reflect negatively on the protectee or her friends/relatives). Afterwards, Mr. Ellis again complained to ATSAIC Iosilevich and "explained that he had not received due process and had done nothing wrong." *Id.* ¶ 118. Finally, Mr. Ellis has adequately alleged that Ms. Yarwood, who had knowledge of his EEO activity, retaliated against him by preventing his promotion to ATSAIC within the Talent Acquisition Division on which he bid on January 16, 2022, *see* Am. Compl., ECF No. 7 ¶¶ 139, 147; and that she released the updated policy on April 1, 2022 that "effectively banned Mr. Ellis from [hard-to-staff] positions," *id.* ¶ 52.

For these reasons, Mr. Ellis has adequately alleged retaliation claims with respect to the false alcoholism accusations, memorandum, administrative leave, handling of the

protectee's complaint, and denial of promotion to the position on which he bid in January 2022. The Court concludes that Mr. Ellis has not, however, sufficiently alleged an inference of retaliation with respect to his disqualification from the hard-to-staff positions in July-August 2021. The most recent protected activity prior to Mr. Ellis's non-selection was a year and a half prior to his non-selection. *See* Am. Compl., ECF No. 7 ¶ 37.[12] Although temporal proximity is not the only way to allege an inference of retaliation, Mr. Ellis puts forth no other basis to make such an inference and accordingly fails to state a retaliation claim for this action.

### 2.    Inference of Discrimination

Defendant argues that Mr. Ellis fails to dispute her arguments as to his purported failure to allege an inference of discrimination for his discrete discrimination claims and, therefore, the Court should deem these arguments conceded and dismiss his discrimination claims in full. *See* Reply, ECF No. 13 at 8. Even though the Court agrees that formalistically, Mr. Ellis fails to specifically dispute many of the arguments that Defendant puts forth about a lack of discriminatory inference, the Court declines to deem Mr. Ellis's entire discrimination

---

[12] Defendant inaccurately states this time gap was at least two years, *see* Reply, ECF No. 13 at 19; but regardless of this mathematical error, the gap in time is far more significant than courts have found to show an inference of retaliation.

claims conceded. To start, Mr. Ellis clearly does not intend to abandon his discrimination claims. *See* Opp'n, ECF No. 12 at 14-15 (maintaining that Mr. Ellis has stated discrimination claims).

Moreover, the parties both cite authority stating that a Title VII plaintiff need not plead all elements of a *prima facie* case of discrimination to survive a motion to dismiss. *See* Mot., ECF No. 10 at 45; Opp'n, ECF No. 12 at 8. Indeed, in a case Defendant cites that discusses the requirement at the pleading stage, another judge on this court reviewed at length the authority from the Supreme Court and D.C. Circuit holding that a plaintiff '"need not plead facts showing each of the[] elements [for a discrimination claim] in order to defeat a motion under Rule 12(b)(6),"' even after *Twombley* and *Iqbal*. *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017) (quoting *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161-62 (D.C. Cir. 2015) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (alterations in original)). Defendant fails to explain how even if Mr. Ellis has not addressed her arguments as to this specific aspect of a *prima facie* case, he has not set forth sufficient "factual allegations, taken collectively" from which "the inferences of discrimination drawn . . . are reasonable and plausibly supported." *See id.* (citations omitted).

Further, the arguments that Defendant raises as to why Mr. Ellis does not satisfy this aspect of his *prima facie* case of discrimination are either inapposite or unconvincing. *See* Mot., ECF No. 10 at 47-50. To summarize, Defendant argues that Mr. Ellis does not allege direct evidence of discriminatory remarks; that the 2011-2019 events and remarks are unrelated to the actions at issue; and that Mr. Ellis's allegations related to his denial of a promotion in 2022 are too sparse. *See id.* And *as* for the other arguments, even if true, these arguments are not based on allegations of direct evidence of discrimination. As noted, however, a discrimination claim may be based on indirect or direct evidence of discrimination. Defendant gives this issue only cursory consideration. *See id.* at 48. In a single line, Defendant asserts that "[n]or does [Mr. Ellis] ever allege that other individuals not sharing his protected characteristics were treated more favorably than him with respect to the same events." *Id.* at 48. This is plainly incorrect, but even if it were not, it would be unwarranted to deem Mr. Ellis's failure to dispute this one line as a concession that all three of his discrimination claims should be dismissed.

Although the allegations are somewhat sparse in his Amended Complaint, Mr. Ellis has alleged facts that plausibly give rise to an inference of discrimination. For example, Mr. Ellis asserted that other employees who had been in similar positions

to him had not been disqualified from hard-to-staff positions,
as he had, despite only serving one year on the PPD. *See* Am.
Compl., ECF No. 7 ¶ 58; *see also id.* ¶ 79 (complaining that
racial discrimination was a barrier in his career path). He also
alleged that he was not selected for the hard-to-staff positions
despite being the top choice. *See id.* ¶¶ 43, 52, 56. Further,
with respect to the administrative leave and allegations of
alcoholism and incident with a protectee, Mr. Ellis alleged that
he "had not received due process and had done nothing wrong."
*Id.* ¶¶ 5, 118. These allegations go beyond Mr. Ellis's general
allegations that the Agency "subjected [him] to disparate
treatment" for various events. *Id.* ¶ 8.

Furthermore, the documents that Defendant attached to her
Motion to Dismiss and are incorporated into Mr. Ellis's Amended
Complaint clearly allege that other white employees were treated
differently with respect to the hard-to-staff positions and
administrative leave. *See* Def. Ex. 5, ECF No. 10-6; *see also*
Mot., ECF No. 10 at 19 (quoting *Wardick v. Fed. Bureau of
Prisons*, Civ. A. No. 19-0184, 2020 WL 1821133, at *4 (D.D.C.
Apr. 10, 2020) (quoting *Hurd v. District of Columbia*, 864 F.3d
671, 678 (D.C. Cir. 2017) (alterations in original) (As
Defendant explains in her Motion, "[i]n considering a Rule
12(b)(6) motion, a court may consider 'the facts alleged in the
complaint, any documents either attached to or incorporated in

the complaint, and matters of which [the Court] may take judicial notice."'). Accordingly, Defendant's one-line statement that Mr. Ellis nowhere alleged to have been treated worse than other comparators is unsupported with respect to his disqualification from the hard-to-staff positions, false allegations of alcoholism, administrative leave, and incident with the protectee. Even though the Court concluded that Mr. Ellis has alleged sufficient details about his non-promotion for the position on which he bid in January 2022 for purposes of his retaliation claim, it concludes that Mr. Ellis has not sufficiently alleged an inference of discrimination for this action based on the limited facts included.

Finally, in addition to the reasons explained above, the Court notes that the authority on which Defendant relies to assert that Mr. Ellis has made this substantial concession makes clear such a decision is discretionary, not mandatory. *See Wannall*, 775 F.3d at 428 (citing *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (additional citations omitted)). In light of the D.C. Circuit's admonition that a plaintiff need not plead all elements of a *prima facie* case to survive a motion to dismiss; the relative limited discussion or irrelevance of Defendant's arguments that Mr. Ellis failed to sufficiently plead such an inference; and that the key argument Defendant addresses in passing is at least

arguable, though unsupported, the Court declines to use its
discretion to take Mr. Ellis's failure to specifically dispute
Defendant's arguments here as a concession that his
discrimination claims must fail. Defendant has not put forth a
persuasive argument for why the Court should do so.

### C. Hostile Work Environment

A hostile work environment exists, in violation of Title
VII, when a "workplace is permeated with 'discriminatory
intimidation, ridicule, and insult' . . . that is 'sufficiently
severe or pervasive to alter the conditions of the victim's
employment and create an abusive working environment,' *Harris*,
510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477
U.S. 57, 65, 67 (internal brackets and quotation marks
omitted)); *see also Joyner v. Morrison & Foerster LLP*, 140 F.4th
523, 534 (D.C. Cir. 2025). The events comprising the hostile
work environment must be '"adequately linked"' to form a
'"coherent"' claim. *Joyner*, 140 F.4th at 534. When assessing
hostile work environment claims, courts consider '"the frequency
of the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance"', *id.* (quoting *Harris*, 501 U.S. at
23); although "no single factor is required", *Harris,* 501 U.S.
at 23. The question of whether an environment is sufficiently

hostile is viewed from the perspective of a reasonable observer and requires consideration of "all of the circumstances", meaning it "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22-23.

Defendant asserts that Mr. Ellis's claim is "based on an 'array of unrelated' acts separated by significant gaps in time involving several different actors or decisionmakers, spanning over a decade between 2011 and 2022." Mot., ECF No. 10 at 51 (citing *Burkes v. Holder,* 953 F.Supp.2d 167, 177 (D.D.C. 2013); *see also Mason v. Geithner,* 811 F.Supp.2d 128, 178 (D.D.C. 2011) (there must be a 'common thread' among the acts comprising the hostile work environment)). Defendant also argues that events giving rise to a hostile work environment claim cannot be unrelated to protected characteristics, and cannot merely be those events that give rise to individual discrimination and retaliation claims. *See id.* at 52-53. Finally, Defendant argues that the events Mr. Ellis alleged here are not severe enough to make a hostile work environment claim. *See id.* at 54. For the reasons explained below, these arguments fail.

First, even though the events span years, Mr. Ellis has alleged that they occurred with relative frequency and were sufficiently related to be viewed as part of the same hostile work environment. The common thread through all of the allegations that Mr. Ellis raises is that he experienced threats

and different treatment due to his protected characteristics
that were either disregarded when he raised concerns to
superiors or resulted in additional mistreatment of him. *See
generally* Am. Compl., ECF No. 7. Specifically, as Mr. Ellis
highlights, in 2011, Mr. Hackney bragged to Mr. Ellis about how
he physically injured people with dark skin, like Mr. Ellis,
while he was a Virginia State Police SWAT Operator; also in
2011, Mr. Hackney began referring to Mr. Ellis derogatorily as a
"Muslim" and referred to Mr. Ellis's vehicle as "that Muslim
car"; Mr. Hackney continued to make similar comments, including
allegedly referring to him as a "Muslim Terrorist", even though
Mr. Ellis informed Mr. Hackney that he was a Christian and
preferred to be identified as American instead of any particular
race or religion; in 2015, Mr. Ellis's white peers consistently
ranked him last despite the head instructor describing him as
part of the top three in the class; also in 2015, Mr. Hackney
"took advantage of an exercise to physically attack Mr. Ellis";
in 2017, Mr. Hackney and another special agent pulled a live
weapon on Mr. Ellis while working a protection detail, an
incident they described as a "joke"; in 2019, Mr. Hackney
"aggressively drove his SUV toward Mr. Ellis, who was walking
with his then-1-year-old child and pregnant wife." Am. Compl. ¶¶
28, 29, 30, 31, 32, 33, 34; Opp'n, ECF No. 12 at 19.

Mr. Ellis alleges that superiors and other colleagues were aware of many of these incidents but took no action to address the discriminatory threats and conduct he endured. *See* Am. Compl., ECF No. 7 ¶¶ 2, 35, 36, 40; *cf Joyner*, 140 F.4th at 534-35 (explaining how the plaintiff had not "plausibly allege that his supervisors were aware of" the harassing incidents). Moreover, according to Mr. Ellis, these supervisors and colleagues dissuaded Mr. Ellis from further reporting the harassing conduct.

Although the nature of the unlawful conduct that Mr. Ellis alleges shifted in the 2021 timeframe from threats of bodily harm to alleged efforts to undermine his career, Mr. Ellis continued to be targeted based on his protected characteristics, including being disqualified from a job for a reason other employees were not and suffering the false allegations of alcoholism, administrative leave based on the false allegations, and requirement that Mr. Ellis write a memorandum about a non-incident with a protectee. *See* Am. Compl., ECF No. 7 ¶¶ 79, 84, 93, 95, 107-116. Mr. Ellis continued to allege that when he raised concerns about racial discrimination, his concerns were dismissed or led to more unlawful conduct. *See e.g.*, Am. Compl., ECF No. 7 ¶ 79. Moreover, he asserted that he received warnings from superiors that the Agency was engaging in discriminatory

actions and that it was not following the procedures it would typically undertake to conduct an investigation.

Second, Mr. Ellis has alleged that the actions comprising his hostile work environment claims occurred because of his race, national origin, and perceived religion. The physical threats and hostility that Mr. Ellis endured from Mr. Hackney and other colleagues were clearly based on his race, color, and perceived religion. *Cf Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (discussing how "none of the comments or actions directed at [the plaintiff] expressly focused on his race, religion, age, or disability—unlike in some hostile work environment cases"). Contrary to Defendant's assertion, and as explained above, Mr. Ellis also alleges that the accusations of alcoholism and misconduct with a protectee, as well as his disqualification and non-selection for various positions, were discriminatory. *See* Am. Compl., ECF No. 7 ¶¶ 2, 3, 8, 39, 40, 79, 130, 154. Keeping in mind that Mr. Ellis need not prove that he will ultimately prevail at this stage of the litigation, he has included sufficient facts to plausibly allege that the harassment and hostility he endured was due to his protected characteristics.

Third, Mr. Ellis has alleged that he suffered events of heightened severity that are distinguishable from the "ordinary tribulations of the workplace." *Brooks v. Grundmann*, 748 F.3d

1273 (D.C. Cir. 2014) (quotations omitted). Defendant asserts
that Mr. Ellis suffered no more than "stray comments, incidents,
and threats, the disqualification from positions, the paid
administrative leave placement, the requirement that he write a
memorandum for the record, the handling of his grievance and
administrative complaints, and his non-selections and non-
promotion[.]" Mot., ECF No. 10 at 53. These events, according to
Defendant, are similar to those in which other courts have
dismissed hostile work environment claims. *See id.* at 54
(discussing cases). Putting aside that Defendant fails to
address the more severe instances that Mr. Ellis alleges, such
as instances of physical threats and harm or false allegations
of misconduct and alcoholism that the Agency never investigated,
the cases she cites generally contain combinations of workplace
allegations that are distinguishable from Mr. Ellis's case. *See*
*id.* (discussing cases in which employers took away employees'
job duties, provided negative performance reviews or placed
employees on performance improvement plans, and in some
instances made comments about protected characteristics).

    As Mr. Ellis points out, courts have denied motions to
dismiss hostile work environment claims based on similar
incidents to those that he has alleged. *See* Opp'n, ECF No. 12 at
18. For example, Mr. Ellis points to *Wise v. Ferriero*, a case in
which the alleged actions included use of a racial slur,

"threats of discipline based on false accusations" and singling out and exclusion of the plaintiff from trainings and promotion opportunities over a few years. *See id.* (citing *Wise v. Ferriero*, 42 F. Supp. 2d 120, 125-26 (D.D.C. 2012)). Similarly, Mr. Ellis points to *Jones v. Granholm*, in which the court denied a motion to dismiss because a plaintiff had alleged that her supervisor issued her a "counseling memorandum, a negative performance review, placed Plaintiff on a performance improvement plan, and . . . 'sabotaged' her work product." *Id.* (citing *Jones v. Granholm*, Civ. No. 20-0472 (CKK), 2021 WL 2530677, at *14 (D.D.C. June 21, 2021). Finally, in *Behrens v. Tillerson*, Mr. Ellis highlights that the court found that the plaintiff plausibly alleged a hostile work environment by alleging that "supervisors denied access to high level assignments, threatened her with termination, forbade her from speaking to high-level [individuals], and unfairly targeted her with negative performance reviews and warnings over the course of several years." *Id.* (citing *Behrens v. Tillerson*, 264 F. Supp. 3d 273, 280 (D.D.C. 2017)).

The conduct that Mr. Ellis alleges is as severe, if not more severe than that described in the cases he cites. Even just focusing on the 2021 events, Mr. Ellis alleges that he was falsely accused of being an alcoholic and of misconduct with a protectee, which led to his being disciplined through his

administrative leave; occurred without the agency following its own procedures; and ultimately there was no investigation to ascertain the veracity of the allegations. Considering also the instances in which Mr. Ellis was physically attacked during a training exercise; threatened with a loaded gun while on a detail; and threatened when Mr. Hackney drove his car aggressively toward Mr. Ellis, his child, and his pregnant wife, Mr. Ellis has amply satisfied the requirement to plausibly allege severe harassment or hostility to survive a motion to dismiss. *See Powell v. Castaneda*, 390 F. Supp. 2d 1, 11 (citing *Morgan*, 536 U.S. at 116). Defendant's attempts to distinguish Mr. Ellis's authority in Reply are not based on any argument that the actions in those cases were somehow more severe than those Mr. Ellis puts forth and therefore, are not persuasive. *See* Reply, ECF No. 13 at 25-26.[13]

For the reasons explained above, Mr. Ellis has sufficiently alleged that he experienced a discriminatory hostile work

---

[13] Several of the ways in which Defendant attempts to distinguish these cases from Mr. Ellis's claim appear to presume that certain factors are necessary to or defeat a hostile work environment claim, such as whether the harassers were also decisionmakers or whether a plaintiff ultimately received a promotion or transfer that they had sought. *See* Reply, ECF No. 13 at 26-28. Defendant concedes, however, that whether a hostile work environment exists requires an analysis of the totality of the circumstances. *See* Mot., ECF No. 10 at 50.

environment and Defendant's motion to dismiss counts V, VI, and VII is denied.

## IV.  Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **September 25, 2025**